# LOAN AND SECURITY AGREEMENT

This Loan and Security Agreement (the "Agreement") is made by and between Rosedale Dodge, Inc. dba Rosedale Leasing, a Minnesota corporation (the "Borrower") and Hyundai Motor Finance Company (the "Lender"), as of the 11th day of August, 2008 (the "Closing Date").

WHEREAS, Borrower has requested that Lender lend to Borrower the sum of $59,795,524, to finance the cost of Borrower's acquisition of motor vehicles including accessories and attachments thereto (each a "vehicle" and collectively, "vehicles") leased or to be leased by Borrower to Southwest-Tex Leasing, Co., Inc., d.b.a. Advantage Rent-A-Car ("Advantage Rent-A-Car");

WHEREAS, Lender has agreed to lend such funds to Borrower upon the terms and subject to the conditions set forth in this Agreement;

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, Borrower and Lender do hereby agree as follows:

1. DEFINITIONS:

As used herein, the following terms shall have the following meanings:

"Allocable Advance Amount" means, with respect to any Financed Vehicle, the amount of the Advance applicable to such Financed Vehicle, as initially set forth on the related Advance Schedule for such Financed Vehicle, which shall be equal to, (x) in the case of a Financed Vehicle drafted to Borrower by Hyundai Motor America ("HMA") within 30 days prior to the Advance Date (as defined below) for such Financed Vehicle, the factory invoice price set forth on the applicable Advance Schedule for such Financed Vehicle and (y) in the case of any other Financed Vehicle, the factory invoice price set forth on the applicable Advance Schedule for such Financed Vehicle less the Depreciation Adjustment Amount, if any; provided that for each of the Financed Vehicles listed on the Advance Schedule attached hereto as Annex I (the "Adjusted Vehicles"), the Allocable Advance Amount shall include the Depreciation Adjustment Amount in the amount of $1,575,000 ("Accrued Depreciation") and the Borrower shall repay such Accrued Depreciation in three installments of $525,000 on each of September 1, 2008, October 1, 2008 and November 1, 2008. Borrower agrees to direct HMA to remit directly to the Lender the amount of any payments, credits or reimbursements made to Borrower on account of the Adjusted Vehicles and such amounts received shall be applied first toward the Accrued Depreciation and after such amount has been paid off, as shall be determined by the Lender in its sole discretion.

"Base Rate" means the floating commercial loan rate of Bank of America, N.A. announced from time to time as its "prime rate" or "base rate" (herein called "prime rate"). Any change in the Bank of America, N.A. prime rate shall effect immediately a corresponding change in the Base Rate. Notwithstanding anything expressed or implied herein to the contrary, it is recognized that the Bank of America, N.A. prime rate and the

**EXHIBIT J**

Base Rate are not necessarily the rates of interest charged by Bank of America, N.A. or Lender to their respective most creditworthy customers.

"Brainerd Guaranty" means that certain Continuing Guaranty and Subordination Agreement, dated as of January 31, 2008 by Baxter Imports LLC, a Minnesota limited liability company ("Brainerd").

"Business Day" means a day of the year other than Saturday or Sunday on which commercial banks are not required or authorized to close in Los Angeles, California, New York, New York or, for purposes of determining the LIBO Rate, London, England.

"Depreciation Adjustment Amount" means, for any Financed Vehicle, an amount, determined by Lender in its sole discretion, that represents the aggregate daily depreciation of such Financed Vehicle from and including the date such Financed Vehicle was drafted to Borrower by HMA to but excluding the Advance Date for such Financed Vehicle.

"Final Maturity Date" means, with respect to any Advance for a Financed Vehicle, the twelfth (12th) Payment Date following the applicable Advance Date of such Advance, as more specifically set forth on the applicable Advance Schedule for such Financed Vehicle; provided that (i) in the case of a Financed Vehicle purchased by Borrower from HMA pursuant and subject to the HMA Repurchase Agreement which has been accepted by HMA under the HMA Repurchase Agreement for repurchase by HMA, such Final Maturity Date will be extended, to the extent occurring later than such twelfth Payment Date, to the date thirty (30) days after the date of the acceptance of such Financed Vehicle for repurchase by HMA, and (ii) in the case of a Financed Vehicle purchased by Borrower from HMA pursuant and subject to the HMA Repurchase Agreement and which is determined to be ineligible for repurchase by HMA under the HMA Repurchase Agreement (other than as a result of the failure by the Borrower to return such Financed Vehicle within the period permitted for the return of such Financed Vehicle pursuant to the HMA Repurchase Agreement (the "Return Period")), such Final Maturity will be extended, to the extent occurring later than such twelfth Payment Date, to (x) the date fifteen (15) Business Days after the date such Financed Vehicle is determined to be ineligible for repurchase or, (y) in the case of a Financed Vehicle determined to be ineligible for repurchase due to the failure to return such Financed Vehicle within the Return Period, fifteen (15) Business Days after the last day of the Return Period.

"HMA Repurchase Agreement" means that certain 2008 Model Year Repurchase Vehicle Sale Agreement, dated as of November 21, 2007, by and between Rosedale and HMA, attached hereto as Exhibit A, or any other repurchase agreement to which Borrower and HMA are a party relating to a Financed Vehicle (including by reason of the assignment and assumption of a repurchase agreement or portion thereof relating to one or more Financed Vehicles by Borrower from any other Person).

"Interest Period" means, (a) initially, the period commencing on (and including) the Advance Date for an Advance and ending on (and excluding) the next succeeding Payment Date, and (b) thereafter, a period commencing on (and including) the next

succeeding Payment Date and ending on (but excluding) the next succeeding Payment Date.

"LAX Guaranty" means that certain Continuing Guaranty and Subordination Agreement, dated as of July 28, 2008, by Advantage Motors-Airport LLC, a California limited liability company ("LAX").

"LIBO Rate" means, relative to any Interest Period, (a) the British Bankers' Association Interest Settlement Rate for deposits in Dollars equal to or nearest to the number of days in such Interest Period that appears on the BBAM page of Bloomberg (or such other page as may replace such page on that service) as of 11:00 a.m., London time, two (2) Business Days prior to the first day of such Interest Period, rounded upwards if necessary to the nearest 1/16th of 1%; (b) if it is not possible to determine the LIBO Rate under clause (a) for any Interest Period, then "LIBO Rate" means the rate per annum determined by the Lender to be the average (rounded upwards if necessary to the nearest $1/16^{th}$ of 1%) of the respective rates as notified by each Reference Bank as the rate at which U.S. Dollar deposits are offered by such Reference Bank to prime banks at approximately 11:00 a.m., London time, two (2) Business Days prior to the beginning of such Interest Period; or (c) if the rates referenced in the preceding clauses (a) or (b) are not available or are not established for any reason for any Interest Period, the "LIBO Rate" shall be equal to the Base Rate for each day during such Interest Period until such rates can be determined pursuant to clause (a) or (b) above.

"Loan Documents" means, collectively, this Agreement, each Note, each Guaranty, each Consent of Guarantor to Additional Borrowing, each Advance Schedule (in each case, as defined below), and each other document delivered in connection with this Agreement.

"Material User Lease" means any use, rental, lease or similar arrangement entered into by Advantage Rent-A-Car with its customer and assigned as security to the Borrower pursuant to the Advantage Lease and related VLO (as defined below) that either (i) constitutes a master lease for a fleet of vehicles by Advantage Rent-A-Car to such customer or (ii) contains a lease term greater than two (2) consecutive months.

"Monthly Amortization" means, with respect to any Financed Vehicle for any calendar month, (i) in the case of a Financed Vehicle subject to an HMA Repurchase Agreement, an amount set forth for such Financed Vehicle on the related Advance Schedule as determined by Lender in its sole discretion to approximate (but need not be identical to) the aggregate "Daily Depreciation Amount" or similar term (as set forth in the related HMA Repurchase Agreement for such Financed Vehicle) that relates to such Financed Vehicle for such calendar month and (ii) in the case of any other Financed Vehicle, 2.0% of the initial Allocable Advance Amount for such Financed Vehicle (as set forth on the applicable Advance Schedule).

"Payment Date" means the first Business Day of each calendar month.

"Reference Banks" means any three internationally recognized money center banks with offices located in New York, New York, as selected by the Lender and reasonably acceptable to the Borrower.

"Termination Date" means August 10, 2009. The Borrower may give notice to the Lender not less than 60 days prior to the then-current Termination Date that it wishes to extend such Termination Date to a date that is 364 calendar days following the then-current Termination Date. The Lender may, in its absolute discretion, agree or not agree to such request for extension, including making its agreement subject to amendment of any of the terms hereof; provided that no determination is required to be made by the Lender earlier than 30 days prior to the then-current Termination Date.

2. LOAN:

a. Subject to the terms and conditions herein, from time to time on any Business Day occurring on and after the Closing Date, but before the Termination Date (each, an "Advance Date"), the Lender agrees to make a loan, in one or more disbursements, to the Borrower (the "Loan", and each disbursement of such Loan, an "Advance") in the aggregate principal amount of up to US$59,795,524 to finance the Borrower's acquisition of certain vehicles listed in the Advance Schedule substantially in the form of Exhibit B attached hereto (the "Financed Vehicles"). The aggregate amount of all Advances made pursuant to this Agreement shall not exceed US$59,795,524, and no amount repaid or prepaid on the Loan or any Advance may be borrowed again.

The Borrower agrees to deliver to the Lender a borrowing request substantially in the form of Exhibit C (a "Borrowing Request") by 11:00 AM New York time at least four (4) Business Days prior to each Advance Date, together with a completed Advance Schedule for such Advance Date. The Lender shall have the right, in its sole discretion, to determine, the extent, if any, to which it will make Advances under the Loan to the Borrower.

b. The Loan shall bear interest at the LIBO Rate plus 2.75% (the "Interest Rate"), payable in arrears on each Payment Date, beginning September 1, 2008.

The Borrower agrees that it will diligently cause the security interests of the Lender to be duly recorded on the certificates of title issued for the Financed Vehicles delivered on an Advance Date and deliver, or cause to be delivered, such certificates of title to the Lender at: Hyundai Motor Finance Company, P.O. Box 105299, Atlanta, Georgia 30348-5299 no later than 90 days from such Advance Date; provided that if, on the 30th day following such Advance Date the Borrower has not delivered such certificates of title to the Lender, Borrower will, on or before the 35th day following such Advance Date, deliver to the Lender a certificate of an authorized officer of the Borrower certifying that such failure is due to delays beyond the reasonable control of the Borrower occurring as a result of processing delays at the department of motor vehicles of any applicable jurisdiction and that the Borrower is exercising reasonable best efforts to correct such failure. The Borrower agrees that with respect to any Financed Vehicle for which the certificate of title has not been received by Lender by the ninetieth (90th) day following the Advance Date for such Financed Vehicle, the Borrower will, at the request of the Lender, immediately pay to Lender the unpaid principal amount of the Advance for such Financed Vehicle.

4   *Loan and Security Agreement*

Notwithstanding the foregoing, upon the occurrence of and during the continuance of any Event of Default by Borrower or any Guarantor under this Agreement, any Note, and/or any Loan Document, the interest rate on the Loan shall be increased to and amounts then outstanding shall bear interest at three percent (3%) over the Interest Rate.

c.  The principal balance of the Advance related to each Financed Vehicle shall be due and payable as follows:

   (1)  on each Payment Date, the aggregate Amortization Amount for all Financed Vehicles for the preceding Interest Period; provided that Borrower shall repay the Accrued Depreciation as set forth in the proviso of the definition of Allocable Advance Amount. The "Amortization Amount" for each Financed Vehicle shall be equal to the Monthly Amortization for such Financed Vehicle; provided that in the case of an Interest Period not equal to a full calendar month, the Monthly Amortization shall be prorated for the number of calendar days in such Interest Period;

   (2)  as any Financed Vehicle is sold pursuant to the HMA Repurchase Agreement, Borrower agrees to direct HMA to remit directly to the Lender the amount of the repurchase price for such Financed Vehicle under the HMA Repurchase Agreement and the Borrower further agrees to remit faithfully and immediately to Lender the remainder (if any) of the outstanding Allocable Advance Amount for such Financed Vehicle after application of the payment by Hyundai Motor America pursuant to the HMA Repurchase Agreement, in each case, within 30 days of the "Acceptance Date" (as such term is defined in the HMA Repurchase Agreement) for such Financed Vehicle by Hyundai Motor America (it being understood that the Borrower is not obligated to make any payments of Monthly Amortization after the Acceptance Date);

   (3)  as any Financed Vehicle is sold (other than pursuant to the HMA Repurchase Agreement), Borrower agrees to remit faithfully and immediately to Lender the amount of the outstanding Allocable Advance Amount related to such Financed Vehicle; provided, however, that absent an Event of Default, Borrower shall have the privilege of paying such amount to Lender no later than the earlier of (i) the fifteenth calendar day after the date of sale of the Financed Vehicle or (ii) the second Business Day after funding the purchase price of such vehicle sale (together with the payment to the Lender of any shortfalls from the sale); provided further that in all instances where such Financed Vehicles are sold by auction, the Borrower agrees to cause the auction house to immediately wire proceeds of the sale directly to the Lender (For purposes of this clause (3), the date of sale of a Financed Vehicle is defined as the earliest to occur of (A) the date of delivery of such Financed Vehicle to the purchaser, (B) the purchase contract date, (C) the date the certificate of title is assigned to the purchaser or its designee, or (4) the date the Borrower is paid for such Financed Vehicle)); and

   (4)  the unpaid principal amount of the Allocable Advance Amount for each Financed Vehicle and all accrued but unpaid interest thereon shall be due and payable on

the applicable Final Maturity Date for the Advance related to such Financed Vehicle. No amount repaid or prepaid on the Loan or any Advance may be borrowed again.

Should the principal of, or any installment of interest on, any Note become due and payable on any day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day, and interest shall be payable with respect to such extension. All payments on the Notes shall be made to Lender at in accordance with the payment instructions set forth on Schedule I hereto or at such other place as the Lender may direct in writing, in federal or other immediately available funds, and payments shall be applied first to accrued interest and then to principal.

d.  Each Advance to be made by Lender to Borrower shall be evidenced by a demand promissory note substantially in the form of Exhibit D (hereinafter called the "Note").

3.  BORROWER'S WARRANTIES: To induce Lender to make the Loan hereunder, Borrower hereby represents, warrants and agrees that on the Closing Date and at the time each Advance is made hereunder:

a.  Borrower shall have the right and the requisite power and authority to make, evidence and secure the Loan and any Advance to be made on such date and to do the character of business conducted by it in each state in which it then conducts its business, and neither the making, evidencing or securing of the Loan or such Advance, nor the conduct of Borrower's business in each state in which it then conducts its business shall be in violation of any restriction imposed by law or contained in Borrower's articles of incorporation, code of regulations, charter, by-laws, if any, or in violation of any restriction imposed by any outstanding agreement or commitment of Borrower; and

b.  There shall have been no change in the assets, liabilities or financial condition of Borrower or the Guarantors from that set forth in the most recent financial statements furnished by Borrower to Lender prior to the Closing Date, other than changes in the ordinary course of business, none of which changes shall have been materially adverse; and

c.  Each Financed Vehicle shall have been delivered to Advantage Rent-A-Car pursuant to an executed vehicle lease approved by Lender (the "Advantage Lease"), the executed original of which Advantage Lease and any vehicle lease order ("VLO") related to such Financed Vehicle must be delivered to and on file with Lender and must not be in default; and

d.  Borrower shall have full and clear title to each Financed Vehicle, registered in its name, subject to the rights of Advantage Rent-A-Car pursuant to the Advantage Lease which shall be junior and subordinate to the rights of the Lender, and a Certificate of Title showing Lender's first priority security interest in such Financed Vehicle shall have been applied for if permitted by law; and

e.  Insurance under a valid and enforceable policy or policies shall have been issued by insurers of recognized standing, protecting the interests of Lender, Borrower and

Advantage Rent-A-Car. Such insurance shall have been obtained with respect to each Financed Vehicle, providing the coverages which shall be satisfactory to the Lender, for a term at least equal to the term of the Advance in respect of such Financed Vehicle; and

f.  The location of Borrower's principal place of business is Minnesota; and

g.  The exact legal name of the Borrower is the name indicated in the signature block for the Borrower at the end of this Agreement; and

h.  Borrower is duly organized or formed, validly existing and, as applicable, in good standing under the laws of the State of Minnesota; and

i.  The Loan is being incurred for commercial purposes and is not a "consumer transaction" or a "consumer-goods transaction" as described and defined in the Uniform Commercial Code as enacted in the State of Minnesota, as amended and replaced from time to time (the "Code"). All of the Collateral, as defined below, is, has been or will be used, acquired or held for commercial purposes and does not constitute "consumer goods" (as described and defined in the Code); and

j.  Borrower shall not use any of the Collateral for, and shall not allow Advantage Rent-A-Car or any other lessee of any Financed Vehicle to use the leased vehicle for, any agricultural purposes.

4.  BORROWER'S COVENANTS: Borrower hereby covenants and agrees with Lender that:

a.  At the time each Advance is made hereunder and at such other time or times as Lender may request, Borrower shall furnish to Lender such evidence as Lender may require with respect to the truth, accuracy and completeness of representations and warranties made by Borrower pursuant to Section 3 hereof or any Loan Document; and

b.  Borrower shall keep proper records and books of account of its business operations and shall furnish to Lender within 10 days after the end of each month hereafter for so long as this Agreement shall be effective or any Advance remains outstanding, copies of Borrower's balance sheet as of the end of each month and related statements of income and surplus for such month, all in such detail as Lender reasonably may require from time to time and certified as to the truth, accuracy and completeness of the information contained therein, in such form and by such officers, employees or representatives of Borrower as Lender reasonably may require from time to time; and

c.  Borrower shall provide (i) for so long as this Agreement shall be effective or any Advance remains outstanding, promptly following the filing thereof, a complete, executed copy of Dennis E. Hecker's federal tax return for such calendar year, (ii) within 180 days after close of each of Borrower's fiscal years hereafter for so long as this Agreement shall be effective or any Advance remains outstanding, a complete, executed copy of a report of an examination of Borrower's financial affairs made by independent certified public accountants selected by Borrower and acceptable to Lender, such report to include Borrower's balance sheets as of the end of such fiscal

year and related statements of income and surplus for such fiscal year in such detail as Lender reasonably may require from time to time and (iii) promptly such financial statements and other information concerning Advantage Rent-A Car and its operations and financial condition as may be requested by Lender from time to time; and

d. Lender or its designee shall have the right to visit and inspect any of the property of Borrower, to examine the books of account of Borrower and to make copies thereof and to discuss the affairs and finances of Borrower with, and to be advised as to the same by, Borrower's officers and representatives at all reasonable times and from time to time and to verify the accuracy of such records and books of account by making inquiry of any other persons or entities Lender desires; and

e. Borrower hereby agrees to reimburse Lender for all taxes, other than Federal, state or local income taxes on Lender's income and all expenses incurred by Lender in connection with the Loan or any Advance, including, without limitation, all stamp and other taxes paid in respect of the execution, delivery or holding of uniform commercial code financing statements or the Notes or the related security instruments, all losses or expenses of the Borrower (including any losses or expenses incurred by reason of the liquidation or reemployment of deposits or other funds acquired by the Lender) as a result of any delay or failure by the Borrower to borrow or repay an Advance after notice to the Borrower thereof or as a result of any payment or prepayment of any Advance made on a date other than on Payment Date, all filing or recording fees in connection with the filing or recording of the related security instruments and all expenses of Lender in connection with the collection of the Loan or any Advance, including reasonable attorneys fees if placed with attorneys, other than salaried employees of Lender, for collection or, if prohibited, the amount permitted by law; and

f. Borrower shall pay to Lender on demand as an additional part of Borrower's indebtedness hereunder, any sum of money that may be paid by Lender on behalf of Borrower in fulfillment of any of Borrower's obligations under this Agreement or the other Loan Documents; and

g. Borrower shall pay to Lender, forthwith upon demand, the unpaid principal amount of the Advance related to any Financed Vehicle that is removed from the service of Advantage Rent-A-Car for any reason (other than an Financed Vehicle that has been accepted for repurchase by HMA pursuant to the HMA Repurchase Agreement), including, without any limitation, the sale, destruction or confiscation thereof, or, with respect to which Advantage Rent-A-Car's payments under the Advantage Lease are and have been delinquent for more than 45 days, or which is the subject of litigation or other dispute so as to impair the value of the vehicle as security for such Advance, together with accrued interest on such Advance to the date of payment; and

h. Notwithstanding any provision of this Agreement to the contrary, this Agreement and the Loan may be cancelled at any time by Lender at its election, without notice or demand, at which time, the Loan and all other sums due Lender shall immediately be payable; and

i. Lender may, in its sole discretion: (i) notify all account debtors, lessees, obligors, makers and other counterparties to all of the Collateral (including lessees of the Financed Vehicles from Advantage Rent-A-Car) of the assignment of the Collateral, (ii) direct such account debtors, lessees, obligors, makers and other counterparties to pay all rentals, payments and other proceeds of and under the Collateral directly to Lender for application to all amounts due on the Loan or under any other Loan Document; and (iii) instruct such account debtors, lessees, obligors, makers and other counterparties to respond to direct inquiries and requests for information from Lender with respect to any and all matters and transactions involving Borrower or its affiliates. Borrower waives all rights of confidentiality and privacy and instructs such account debtors, lessees, obligors, makers and other counterparties to provide Lender with whatever information and schedules Lender may require; and

j. Lender may file whatever financing and continuation statements, amendments and other documents, and may take whatever additional actions, Lender deems to be necessary and proper to perfect and continue perfection of Lender's security interests in any of the Collateral. Lender may file a carbon, photographic, facsimile, other reproduction or electronically authenticated or maintained copy of any financing statement or of this Agreement or any Advance Schedule or security agreement for use as a financing statement. Lender may make electronic filings of financing and other statements. All filings permitted under this paragraph, including without limitation, electronic filings, will be deemed to be complete and perfected for all purposes when made by Lender and may be made by Lender without Borrower's consent and without the necessity that Borrower (or Lender on Borrower's behalf) sign any such financing statements or other perfection documents. Without limitation of the generality of the foregoing: (i) to the extent that any of the Collateral is held by a third party (such as consignee or bailee, but not a lessee) (A) notice of the security interest created by this Agreement in such Collateral shall be given to each such third party and (B) Borrower shall, upon the request of Lender, obtain and deliver to Lender a written and signed acknowledgement from each such third party that it is holding the Collateral for the benefit of Lender; (ii) to the extent that any of the Collateral is comprised of electronic chattel paper, Borrower will ensure that (A) there is only one identifiable authoritative copy of the electronic chattel paper record, (B) the authoritative electronic chattel paper record for all electronic chattel paper which comprises a part of the Collateral will identify Lender as the first priority lienholder thereof, (C) the authoritative electronic chattel paper record for all electronic chattel paper which comprises a part of the Collateral will be transferred to and maintained by Lender or a third party custodian designated by Lender and (D) changes or conditions to the electronic chattel paper may not be made without the consent of Lender; and (iii) to the extent that any of the Collateral is comprised of types of Collateral that can be perfected by possession or by either possession or filing (including, without limitation, the Advantage Lease, each VLO and all other leases of vehicles (excluding any use, rental, lease or similar arrangement entered into by Advantage Rent-A-Car with its customer and assigned as security to the Borrower pursuant to the Advantage Lease and related VLO other than Material User Leases)), all such Collateral shall be delivered to Lender. Lender is authorized to obtain all post-filing searches from all jurisdictions that Lender deems advisable to confirm the proper priority of all filings made by Lender under this Agreement or any Advance Schedule or security agreement. Borrower agrees to

execute any further documents, and to take any further actions, reasonably requested by Lender to evidence, perfect or protect the security interests granted herein or under any Advance Schedule or security agreement or to effectuate the rights granted to Lender herein or under any Advance Schedule or security agreement. Borrower shall reimburse Lender for all expenses incurred with respect to the perfection and the continuation of the perfection of Lender's security interests in the Collateral. Borrower appoints Lender its true and lawful attorney-in-fact, coupled with an interest, for it and in its name, to execute and sign on behalf of Borrower, and to take all acts on behalf of Borrower, that are required to perfect, maintain and protect Lender's security interest in the Collateral, including the execution of financing statements and other documents on behalf of Borrower. Such power of attorney may not be revoked; and

k.  Borrower hereby indemnifies and agrees to hold harmless Lender against all liability whatsoever and howsoever arising in connection with or because of any Financed Vehicle or the use, operation or ownership of any such Financed Vehicle or any damage to or loss, destruction or theft of the same; and

l.  This Agreement and any Advance to be made by Lender to Borrower shall not be assigned by Borrower without the express prior written consent of Lender, in each case; and

m.  Borrower agrees that so long as this Agreement remains effect or there shall remain any amounts outstanding hereunder or under the Notes, Lender does not authorize, and Borrower will not, without the prior written consent of Lender: (i) grant any security interest in any of the Collateral other than pursuant to this Agreement, any Advance Schedule or any security agreement contemplated hereby in favor of the Lender (ii) engage in any business other than the business in which Borrower is presently engaged, (iii) sell, assign or transfer any assets except in the regular course of business, (iv) retire, pay dividends on, or otherwise make a distribution of capital except from earned surplus, (v) amend, supplement, restate, modify, or terminate any HMA Repurchase Agreement or any provision thereof (or consent to any of the foregoing), without the prior written consent of the Lender; and

n.  Borrower agrees to maintain in its business net working capital and subordinated net worth in at least the amounts set forth from time to time by Lender. (As used herein, the term "net working capital" shall mean the excess of Borrower's current assets other than vehicles over Borrower's current liabilities other than liabilities for money borrowed with respect to vehicles, and the term "subordinated net worth" shall mean the excess of all of Borrower's assets other than good will and patent, trademark, franchise and operating rights over all of Borrower's liabilities not subordinated to the claims of Lender); and

o.  Nothing in this Agreement shall be interpreted to prohibit Borrower from leasing vehicles in the ordinary course of business to Advantage Rent-A-Car and other lessees as long as: (i) each Financed Vehicle becomes subject to the Advantage Lease and each other lease of vehicles is on Borrower's standard form of lease; (ii) the lease, by its terms, does not prohibit its assignment to Lender; and (iii) the original executed lease is delivered to Lender as set forth elsewhere in this Agreement; and

p.      Borrower will not change and will not allow any change in (i) the location of Borrower's principal place of business, (ii) state of organization, (iii) the legal name of Borrower, (iv) the type of business entity under which the Borrower is organized or formed; (v) the state in which any of the Collateral (other than vehicles) is located; or (vi) the state in which any vehicle is titled or primarily garaged; in each case, without the prior written consent of Lender. In addition, the Borrower shall not merge into, acquire, be acquired by or consolidated with any other person or entity. While Borrower has no right to take any of the actions described in this paragraph without the prior written consent of Lender, if the Borrower does so (or if any of such actions occur due to the act of any lessee of any vehicle), Borrower will immediately notify Lender of any such actions.

5.      GRANT OF SECURITY INTEREST:

a.      To secure the timely payment of all obligations owing by the Borrower and the performance and observance of all the obligations and liabilities of the Borrower contained in this Agreement and the other Loan Documents and any other obligation owed to Lender or its affiliates by Borrower or any of its affiliates, including in the form of a contingent obligation such as a guaranty (including the Brainerd Guaranty and the LAX Guaranty), the Borrower hereby conveys, warrants, assigns, transfers, pledges and grants a first and prior security interest onto the Lender in all of the Borrower's right, title, and interest in and to the following property, whether now or hereafter existing, owned or acquired by the Borrower, and wherever located: all Financed Vehicles including any and all attachments and accessories thereto; all proceeds of any sale, exchange, lease or other disposition of the Financed Vehicles; the Advantage Lease and all VLOs executed pursuant thereto, and all other leases related to the Financed Vehicles (including any use, rental, lease or similar arrangement entered into by Advantage Rent-A-Car with its customer and assigned as security to the Borrower pursuant to the Advantage Lease and related VLO); all receipts and rights of the Borrower against third parties for damage or other claims (including without limitation, tort claims), all insurance or requisition proceeds and condemnation awards; all warranties payable by reason of defect, loss or damage, all chattel paper (including the Advantage Lease and all other leases of the Financed Vehicles (including any use, rental, lease or similar arrangement entered into by Advantage Rent-A-Car with its customer and assigned as security to the Borrower pursuant to the Advantage Lease and related VLO)), electronic chattel paper (including the Advantage Lease and all other leases of the Financed Vehicles (including any use, rental, lease or similar arrangement entered into by Advantage Rent-A-Car with its customer and assigned as security to the Borrower pursuant to the Advantage Lease and related VLO)), accounts, deposit accounts, goods, investment property, instruments, promissory notes, supporting obligations, documents, payment intangibles, contracts, general intangibles and letters-of-credit and letters-of-credit rights (in each case, to the fullest extent described and defined in the Code); all books, records, writings, databases, information and other property relating to, used or useful in connection with, evidencing, embodying, incorporating or referring to, any of the foregoing in this <u>clause (a)</u>; all other property and rights of every kind and description and interests therein; and all proceeds of the foregoing of any kind and nature whatsoever (to the fullest extent defined and described in the Code) (all of which is collectively

called the "Collateral"). The definitions of the types of Collateral described in this paragraph are intended to change, expand and contract as the definitions and descriptions of such types of Collateral that are set forth in the Code change, expand or contract. Each Advance is being used to purchase Financed Vehicles, thereby creating a purchase money priority security interest in such Financed Vehicles and certain other items of Collateral. Such purchase money priority security interest in the Financed Vehicles and such other items of Collateral pursuant to any Advance also secures all other Advances and any other obligation that may, from time to time, be owing to Lender or any affiliate of Lender by Borrower or any affiliate of Borrower.

Notwithstanding the foregoing, "Collateral" shall not include (A) the Borrower's real property interests, (B) any general intangibles or other rights arising under any contracts, instruments, licenses or other documents as to which the grant of a security interest would (1) constitute a violation of a valid and enforceable restriction in favor of a third party on such grant, unless and until any required consents shall have been obtained, or (2) give any other party to such contract, instrument, license or other document the right to terminate its obligations thereunder.

b.  Without limitation of the general assignment of leases of the Collateral (and the proceeds thereof) set forth above, or of the inclusion of such leases and the proceeds thereof in the Collateral, for value received, the Borrower does hereby sell, assign and transfer to Lender, its successors and assigns all of its right, title and interest to all proceeds (to the fullest extent described and defined in the Code) of any and all leases of the Collateral described above, due and to become due from any lessee of the Collateral, to Lender, as additional collateral security for the Obligations.

6.  CONDITIONS PRECEDENT:

a.  The execution and delivery of this Agreement by the Lender on the Closing Date shall be subject to the condition that the Lender shall have received all of the following documents in form and substance acceptable to the Lender:

   i.   A certificate of the Secretary of the Borrower certifying (i) the resolutions of the Borrower's board of directors approving the Loan Documents, (ii) the name, signature and authority of each officer who executes a Loan Document on the Borrower's behalf, (iii) the Borrower's certificate of formation or articles of incorporation, as applicable, and (iv) a copy of the Borrower's bylaws or other governing instrument.

   ii.  A certificate of the Secretary of LAX certifying (i) the resolutions of the Board of Managers of LAX approving the LAX Guaranty, (ii) the name, signature and authority of each officer who executes a Loan Document on behalf of LAX, (iii) Articles of Organization of LAX and (iv) a copy of the Operating Agreement of LAX.

   iii. A certificate of the Secretary of Brainerd (Brainerd together with LAX, the "Cross-Corporate Guarantors") certifying (i) the resolutions of Brainerd's Board of Governors approving the Consent of Guarantor to Additional Borrowing, (ii)

        the name, signature and authority of each manager who executes a Loan Document on Brainerd's behalf, (iii) Brainerd's Articles of Organization and (iv) a copy of Brainerd's Operating Agreement.

iv.    Good standing certificates issued as of a recent date by the applicable office of the respective jurisdictions where the Borrower and each Cross-Corporate Guarantor are organized.

v.    UCC search reports from all jurisdictions the Lender reasonably requests.

vi.    Guaranties in the form of <u>Exhibit E</u> attached hereto (the "<u>Guaranties</u>"), duly executed and delivered by LAX and Consents of Guarantor to Additional Borrowing in the form of <u>Exhibit F</u> duly executed and delivered by Dennis E. Hecker and Brainerd (each a "<u>Guarantor</u>").

vii.    Executed counterparts of this Agreement and each other Loan Document to be executed in connection with this Agreement on the Closing Date.

viii.    An executed counterpart of the Advantage Lease.

b.    The obligation of the Lender to advance funds on any Advance Date is subject to the condition that the Lender shall have received all of the following documents in form and substance acceptable to the Lender:

i.    A Borrowing Request, executed and delivered by the Borrower in accordance with <u>Section 2(a)</u>, including a properly completed Schedule II thereto listing the proposed Financed Vehicles to be financed on such Advance Date.

ii.    Executed counterparts of the Advance Schedule with respect to the Financed Vehicles to be financed on such Advance Date, and all other instruments and documents required to perfect the Lender's first priority security interest in the Collateral, including such Financed Vehicles, in all appropriate jurisdictions.

iii.    A certificate of an authorized officer of the Borrower certifying that (i) the representations and warranties set forth in each Loan Document are true and correct in all material respects with the same effect as if then made (unless stated to relate solely to an earlier date, in which case such representations and warranties were true and correct in all material respects as of such earlier date), in each case other than representations and warranties that are subject to a materiality qualifier, in which case such representations and warranties are true and correct; (ii) the Borrower and each Guarantor are in material compliance with each covenant set forth in each Loan Document; and (iii) no Event of Default shall have occurred and be continuing.

iv.    Executed counterparts of a Note, in the amount of the Advance to be made on such Advance Date, and each other Loan Document to be executed in connection with this Agreement on such Advance Date.

    v.    An executed counterpart of each VLO and/or other lease related to the Financed Vehicles to be financed on such Advance Date.

    vi.    A certified copy of the Manufacturer's invoice for each of the Financed Vehicles to be financed on such Advance Date.

7.   DEFAULT:

Time is of the essence hereof and shall be of the essence for the Notes evidencing the Loan. The occurrence of any of the following shall constitute an "Event of Default":

a.   default shall be made in the due and punctual payment of any principal of, or interest on, any Note or any other amount payable under the Loan Documents when the same becomes due and payable;

b.   Borrower shall default in the due performance of any provision hereof or of any Loan Document;

c.   any representation or warranty made by Borrower herein or under any Loan Document or in connection herewith or therewith shall be determined by the Lender to have been false or materially incomplete at the time of the making thereof;

d.   Borrower shall make or attempt to make a general assignment for the benefit of Borrower's creditors, or a proceeding in bankruptcy, receivership or insolvency shall be instituted by or against the Borrower or any Guarantor or Advantage Rent-A-Car;

e.   Borrower, any Guarantor, any other affiliate of the Borrower, or any entity majority-owned, directly or indirectly, by Dennis Hecker breaches any other agreement with Lender;

f.   Lender reasonably deems any vehicle in danger of misuse or confiscation or otherwise reasonably deems the Loan, any Advance or any Financed Vehicle insecure;

g.   any Guaranty ceases to be in full force and effect or is declared null and void or otherwise not enforceable against its Guarantor in accordance with its terms, or any Guarantor repudiates its obligations under its Guaranty or denies that it has any further liability under its Guaranty or gives notice to such effect; or

h.   any Collateral shall be foreclosed or levied against or proceeding for the same is commenced or the Lender shall not longer have a first priority security interest in any of the Collateral.

If an Event of Default occurs, then, in addition to the rights of Lender under any other section of the Loan Agreement, including Sections 4(e) and 4(f) above: (i) Lender shall have the right, at its election, to declare the unpaid principal balance of the Loan made hereunder and all accrued interest with respect thereto, and all other amounts for which Borrower shall have become obligated hereunder or under any other Loan Document, immediately to be due and payable; (ii) Lender, its agents, or representatives, may take immediate possession of any Financed Vehicle

and/or other Collateral and for this purpose may enter upon the premises where the same may be and remove same; (iii) upon demand, Borrower will assemble the Financed Vehicles and/or other Collateral and make them available to Lender at a location designated by Lender which shall be reasonably convenient to Lender and Borrower; (iv) Lender may sell any or all of the Financed Vehicles and/or other Collateral at public sale, at which Lender may purchase, or dispose of the same, or otherwise in such manner and upon such terms as shall appear to Lender to be reasonable without demand for performance and with such notice to Borrower, if any, as may be required by law, with or without having such Financed Vehicle and/or other Collateral at the place of sale or disposition; (v) Lender may retain some or all of the Financed Vehicles and other Collateral in either full or partial satisfaction of the Loan as determined by Lender, Borrower acknowledging and agreeing that (A) Borrower will remain liable to Lender for any deficiency amount remaining after crediting against the Loan the value received by Lender as a result of the Financed Vehicles and other Collateral that was so retained and (B) the mere repossession of some or all of the Financed Vehicles and other Collateral by Lender shall not constitute a retention of such Financed Vehicles and other Collateral in either full or partial satisfaction of the Loan unless Lender notifies Borrower in writing that Lender is retaining some or all of the Financed Vehicles and other Collateral in partial or full satisfaction of the Loan; and (vi) Lender may collect and enforce, against the account debtors under, obligors under, makers of or other counterparties to any Collateral, all Collateral (including vehicle leases (including any use, rental, lease or similar arrangement entered into by Advantage Rent-A-Car with its customer and assigned as security to the Borrower pursuant to the Advantage Lease and related VLO)) that is comprised of accounts, chattel paper (including electronic chattel paper), instruments, promissory notes, supporting obligations, documents, general intangibles, payment intangibles and the proceeds thereof. With respect to any sale of some or all of the Financed Vehicles and other Collateral by Lender under this paragraph: (A) Lender has no obligation to clean-up or otherwise prepare any Financed Vehicle or other Collateral for sale; (B) Lender may, in any such sale, specifically disclaim any warranties of title or fitness or any other warranties that are legally waivable; (C) Lender may comply with any applicable state or federal law requirements in connection with the Financed Vehicles and other Collateral, and the disposition thereof, and such compliance will not be considered to adversely affect the commercial reasonableness of any sale of the Financed Vehicles and other Collateral; (D) Borrower agrees that ten (10) days prior written notice of any sale of the Financed Vehicles and other Collateral (other than perishable Collateral or other quickly diminishing (whether in value or existence) Collateral, for which shorter notice periods will be allowed), shall be deemed to be reasonable notice of such sale, whether such sale is public, private or a strict foreclosure; and (E) if Lender sells any of the Financed Vehicles and other Collateral upon credit (x) the Loan will be credited only with payments actually made by the purchaser of such Financed Vehicles and/or other Collateral that are received by Lender and applied to the Loan and (y) in the event the purchaser fails to pay for such Financed Vehicles and other Collateral, Lender may resell such Financed Vehicles and other Collateral and no portion of the unpaid sales price due from the purchaser will be credited against the Loan. Borrower waives any right it may have to require Lender to pursue any third party for the Loan or any Advance. The proceeds of any such sale or disposition shall be applied first to the actual and reasonable cost of such sale, next to the actual and reasonable cost of retaking and storing of the Financed Vehicle and/or other Collateral and then to the satisfaction of all interest on and the unpaid balance of the Loan. If the proceeds of such sale are not sufficient to defray such expenses and to satisfy all amounts due, by acceleration or otherwise, with respect to the Loan, Borrower shall pay, and Lender may recover the deficiency with interest at the Default Rate. Further, Borrower shall assign and deliver to Lender all of its

remaining right, title and interest in and to the Advantage Lease and each other lease of a Financed Vehicle forthwith upon the acceleration of the time or times of payment of the Loan as hereinbefore provided, and if Borrower fails to make such assignment, Lender may do so as attorney-in-fact for Borrower, and upon the occurrence of an Event of Default hereunder, Borrower hereby constitutes and appoints Lender its attorney-in-fact to execute, in Borrower's name, motor vehicle certificates of title and registrations and to endorse Borrower's name on checks, drafts and other negotiable instruments. Each remedy provided to Lender herein shall be cumulative and shall be in addition to every other remedy given hereunder, under a Loan Document, or provided by law, under the Code or in equity.

Borrower shall reimburse Lender for all costs and expenses (including without limitation, Lender's reasonable legal costs and expenses) incurred by Lender in exercising any of Lender's rights and remedies under this Agreement or any of the other Loan Documents.

8. GENERAL: It is hereby further agreed that:

a. This Agreement may not be changed orally but only by an agreement in writing duly executed by Lender and Borrower; and

b. By accepting or approving any insurance or any document or instrument, including, without limitation, the Advantage Lease or any other vehicle lease, note, security document, or insurance policy, Lender shall not be deemed to have warranted or represented the sufficiency, legality, effectiveness or legal effect of the same, or of any term, provision or condition thereof and such acceptance or approval thereof shall not be or constitute any warranty or representation with respect thereto by Lender; and

c. Acceptance by Lender of any payment after it may have become due, or the waiver by Lender of any Event of Default, shall not be deemed to alter or affect Borrower's obligations and Lender's rights with respect to any other payment or Event of Default. Borrower waives notice of Lender's acceptance hereof and waives presentment, demand, protest and notice of non-payment or protest as to any Note or as to any related security instrument and any other demands or notices required by law, and waives all setoffs and counterclaims; and

d. Any provision of this Agreement, or any provision of any Note or any provision of any related security instrument, prohibited by the law of any state, shall, as to such state, be ineffective to the extent of such prohibition without invalidating the remaining provisions thereof; and

e. All agreements, covenants, representations and warranties made by Borrower in this Agreement, and all statements contained in any financial statement, certificate or related security instruments delivered by Borrower hereunder shall be deemed to constitute agreements, covenants, representations and warranties made by Borrower and shall survive the execution and delivery of this Agreement and shall remain in full force and effect until all amounts owing to Lender hereunder or under any other Loan Document, including the Loan, have been paid in full or otherwise fully discharged; and

f. All notices, requests and other communications pursuant to this Agreement shall be in writing, either by letter (delivered by hand or sent by certified mail, return receipt requested), or by facsimile, addressed to the address or number set forth on the signature pages hereof or at such other address or facsimile number as such party may specify. Any notice, request or communication hereunder shall be deemed to have been given when deposited in the mail, postage prepaid, or, in the case of facsimile, when received and such receipt is confirmed by a subsequent telephone conversation. Any party may change the person or address to which the notices are to be given hereunder, but any such notice shall be effective only when actually received by the party to whom it is addressed; and

g. This Agreement may be executed in any number of separate counterparts, each of which when so executed and delivered shall be an original, and all such counterparts shall together constitute one and the same instrument. Delivery of a counterpart hereof, or a signature page hereto, by facsimile or other electronic transmission shall be effective as delivery of a manually-signed counterpart hereof; and

h. This Agreement shall be binding on the successors and assigns of Borrower from the date hereof and upon the successors and assigns of Lender, from the date of its acceptance hereof until terminated by a written notice from either the Borrower or Lender to the other, but any such termination shall not relieve either of them from obligations incurred prior to the effective date of such notice.

I. THIS AGREEMENT AND EACH NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK (INCLUDING, WITHOUT LIMITATION, SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK).

j. ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST ANY PARTY HERETO ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR ANY OBLIGATION RELATED THERETO MAY BE BROUGHT IN ANY STATE COURT OF COMPETENT JURISDICTION IN NEW YORK, NEW YORK, OR IN ANY FEDERAL COURT OF COMPETENT JURISDICTION IN THE SOUTHERN DISTRICT OF NEW YORK, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT EACH SUCH PARTY ACCEPTS FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY, THE NONEXCLUSIVE JURISDICTION OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS AND IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY IN CONNECTION WITH THIS AGREEMENT, SUCH OTHER LOAN DOCUMENT OR SUCH OBLIGATION (SUBJECT TO ANY RIGHT OF APPEAL BY A HIGHER COURT). The Borrower hereby agrees that service of all process in any such proceeding in any such court may be made by registered or certified mail, return receipt requested, to the Borrower at its address provided in Section 7(f), such service being hereby acknowledged by the Borrower to be sufficient for personal jurisdiction in any action against the Borrower in any such court and to be otherwise effective and binding service in every respect. Nothing herein shall affect the right to serve process in any other manner permitted by law or shall limit the

right of the Lender to bring proceedings against the Borrower in the courts of any other jurisdiction.

k.  EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE AND DOES WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL IN ANY ACTION BROUGHT ON OR WITH RESPECT TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION HEREWITH OR THEREWITH. The scope of the above waiver and agreement is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this transaction, including without limitation contract claims, tort claims, breach of duty claims and all other common law and statutory claims. Each party hereto acknowledges that the above waiver and agreement is a material inducement to enter into a business relationship, that each has already relied on the above waiver and agreement in entering into this Agreement, and that each will continue to rely on the above waiver and agreement in their related future dealings. Each party hereto further warrants and represents that it has reviewed the above waiver and agreement with its legal counsel and that it knowingly and voluntarily waives its jury trial rights and agrees as described above following consultation with legal counsel. In the event of litigation, this Agreement may be filed as written consent to a trial by the court or by judicial reference proceeding, as applicable. IF ANY ACTION OR PROCEEDING IS FILED IN A COURT OF THE STATE OF CALIFORNIA BY OR AGAINST ANY PARTY HERETO IN CONNECTION WITH ANY OF THE TRANSACTIONS CONTEMPLATED BY ANY LOAN DOCUMENT AND EACH PARTY HERETO OR THERETO DOES NOT SUBSEQUENTLY WAIVE IN AN EFFECTIVE MANNER UNDER CALIFORNIA LAW ITS RIGHT TO A TRIAL BY JURY, (i) THE COURT SHALL, AND IS HEREBY DIRECTED TO, MAKE A GENERAL REFERENCE PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 638 TO A REFEREE OR REFEREES TO HEAR AND DETERMINE ALL OF THE ISSUES IN SUCH ACTION OR PROCEEDING (WHETHER OF FACT OR OF LAW) AND TO REPORT A STATEMENT OF DECISION, PROVIDED THAT ANY SUCH ISSUES PERTAINING TO A "PROVISIONAL REMEDY" AS DEFINED IN CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 1281.8 SHALL BE HEARD AND DETERMINED BY THE COURT, AND (ii) THE BORROWER SHALL BE SOLELY RESPONSIBLE TO PAY ALL FEES AND EXPENSES OF ANY REFEREE APPOINTED IN SUCH ACTION OR PROCEEDING.

*[Signatures follow]*

IN WITNESS WHEREOF this Agreement has been executed by the parties to it on the date stated at the beginning of this Agreement.

ROSEDALE DODGE, INC., DBA ROSEDALE LEASING, as Borrower

By: _____
Name: Dennis E. Hecker
Title: Chairman and Chief Executive Officer

HYUNDAI MOTOR FINANCE COMPANY,
as Lender

By: _____
Name: Sam Frobe
Title: National Manager, Commercial Credit