

WALDEN PROPERTIES OF FOREST
LAKE, LLP, a Minnesota limited liability
partnership

By:   Walden Investment Company,
      a Minnesota corporation,
      *Its General Partner*

By:_____
Name: Erik P. Dove
Its:    Vice President

MONTICELLO MOTORS LLC,
a Minnesota limited liability company

By:_____
Name: Erik P. Dove
Its:    Vice President

JACOB HOLDINGS OF SOUTH
ROBERT TRAIL LLC, a Minnesota
limited liability company

By:_____
Name: Erik P. Dove
Its:    Vice President

INVER GROVE HYUNDAI LLC, a
Minnesota limited liability company

By:_____
Name: Erik P. Dove
Its:    Vice President

FOREST LAKE IMPORTS LLC,
a Minnesota limited liability company

By:_____
Name: Erik P. Dove
Its:    Vice President

{00016905.DOC;2}




JACOB HOLDINGS OF INVER
GROVE LLC, a Minnesota limited
liability company

By: _____
Name: Erik P. Dove
Its:    Vice President


DEN-STAR AVIATION, INC.,
a Minnesota corporation

By: _____
Name: Erik P. Dove
Its:    Vice President


WALDEN FLEET SALES GROUP, INC.
a Minnesota corporation

By: _____
Name: Erik P. Dove
Its:    Vice President


JACOB HOLDINGS OF REDWOOD
LLC, a Minnesota limited liability
company

By: _____
Name: Erik P. Dove
Its:    Vice President


JACOB PROPERTIES OF MINNESOTA
LLC, a Minnesota limited liability
company

By: _____
Name: Erik P. Dove
Its:    Vice President

 

AUTOCAL, LLC
a California limited liability company

By:
Name: Dennis E. Hecker
Its:    Managing Member

JACOB HOLDINGS OF IRVINE LLC,
a Minnesota limited liability company

By:
Name: Erik P. Dove
Its:    Vice President

AUTOCAL SOUTH, LLC
a California limited liability company

By:
Name: Dennis E. Hecker
Its:    Managing Member

JACOB HOLDINGS OF LONG LAKE
ROAD LLC, a Minnesota limited liability
company

By:
Name: Erik P. Dove
Its:    Vice President

JACOB HOLDINGS OF AKRON
AVENUE LLC, a Minnesota limited
liability company

By:
Name: Erik P. Dove
Its:    Vice President

ROSEDALE DODGE LLC,
a Minnesota limited liability company

By:
Name: Erik P. Dove
Its:    Vice President

{00016905.DOC;2}

JACOB HOLDINGS OF MONTICELLO
LLC, a Minnesota limited liability
company

By: _____
Name: Erik P. Dove
Its:    Vice President


JACOB HOLDINGS OF SANDBERG
ROAD LLC, a Minnesota limited liability
company

By: _____
Name: Erik P. Dove
Its:    Vice President


MONTICELLO FORD-MERCURY INC.,
a Minnesota corporation

By: _____
Name: Erik P. Dove
Its:    Vice President


INVER GROVE MOTORS LLC,
a Minnesota limited liability company

By: _____
Name: Erik P. Dove
Its:    Vice President


WALDEN INVESTMENT COMPANY,
a Minnesota corporation

By: _____
Name: Erik P. Dove
Its:    Vice President


JACOB HOLDINGS OF BLAINE LLC,
a Minnesota limited liability company

By: _____
Name: Erik P. Dove
Its:    Vice President

{00016905.DOC;2}




IN WITNESS WHEREOF, each New Guarantor has duly executed this **Second Amendment and Joinder to Guarantor Loan Documents and Consent of Guarantors** on the day and year first written above.

STATE OF MINNESOTA   )
           ) SS.
COUNTY OF HENNEPIN   )

  The foregoing instrument was acknowledged before me this _16_ day of August, 2006, by Dennis E. Hecker as Managing Member of Autocal, LLC, and Autocal South, LLC, each a California limited liability company of and on behalf of each company.



         Notary Public
         Hennepin County,
         State of Minnesota
         My Commission Expires:

JEAN G SCHULDT
NOTARY PUBLIC - MINNESOTA
My Commission Expires 01/31/2010

STATE OF MINNESOTA  &emsp)
           ) SS.
COUNTY OF HENNEPIN   )

  The foregoing instrument was acknowledged before me this _16_ day of August, 2006 by Erik P. Dove, in his capacity as Vice-President of the above limited liability companies corporations and partnerships of and on behalf said companies, corporations and partnerships.



         Notary Public
         Hennepin County,
         State of Minnesota
         My Commission Expires:

JEAN G SCHULDT
NOTARY PUBLIC - MINNESOTA
My Commission Expires 01/31/2010

{00015905.DOC;2}

 

*Additional Executed Copy*

## THIRD AMENDMENT AND JOINDER TO GUARANTOR LOAN DOCUMENTS AND CONSENT OF CURRENT GUARANTORS

This Third Amendment and Joinder to Guarantor Loan Documents and Consent of Current Guarantors (the "Amendment") is made this __21__ day of March, 2007, by the following:

1.    **Lake Country Auto Center, Inc.; Walden Fleet Group, Inc.; Southview Chevrolet Co.; Rosedale Dodge, Inc.; Stillwater Ford, Lincoln-Mercury, Inc.; Hudson Auto Sales, Inc.; Rosedale Leasing LLC; Eden Prairie Auto Properties, LLP; Jacob Holdings of St. Louis Park LLC; Jacob Holdings of Burnsville LLC; Walden Properties of Forest Lake, LLP, WBDH Realty, LLP; Dennis E. Hecker; Jacob Holdings of Stillwater LLC; Jacob Holdings of Hudson LLC; Jacob Holdings of Forest Lake LLC; Jacob Holdings of Roseville LLC; Monticello Motors LLC; Jacob Holdings of South Robert Trail LLC; Inver Grove Hyundai LLC; Forest Lake Imports, Inc.; Den-Star Aviation, Inc.; Jacob Holdings of Inver Grove LLC; Walden Fleet Sales Group, Inc.; Jacob Holdings of Redwood LLC; Jacob Properties of Minnesota LLC; Autocal, LLC; Jacob Holdings of Long Lake Road LLC; Jacob Holdings of Akron Avenue LLC; Rosedale Dodge LLC, Jacob Holdings of Monticello LLC, Jacob Holdings of Sandberg Road LLC; Monticello Ford-Mercury Inc.; Inver Grove Motors LLC; Jacob Holdings of Blaine LLC; and Walden Investment Company** (collectively the **"Current Guarantors"**)

    and

2.    **Jacob Holdings of Texas LLC** (the **"New Guarantor"**) for the benefit of **DAIMLERCHYRSLER FINANCIAL SERVICES AMERICAS LLC**, a Michigan limited liability company (formerly known as DAIMLERCHYRSLER SERVICES NORTH AMERICA LLC AND CHRYSLER FINANCIAL COMPANY L.L.C.), whose address is 27777 Inkster Rd., Farmington Hills, MI 48334 (the **"Lender"**).

### WITNESSETH:

WHEREAS, some or all of Lake Country Auto Center, Inc.; Walden Fleet Group, Inc.; Southview Chevrolet Co.; Rosedale Dodge, Inc.; Stillwater Ford, Lincoln-Mercury, Inc.; Hudson Auto Sales, Inc.; Rosedale Leasing LLC; Eden Prairie Auto Properties, LLP; Jacob Holdings of St. Louis Park LLC; Jacob Holdings of Burnsville LLC; Walden Properties of Forest Lake, LLP, WBDH Realty, LLP; Dennis E. Hecker; Jacob Holdings of Stillwater LLC; Jacob Holdings of Hudson LLC; Jacob Holdings of Forest Lake LLC; Jacob Holdings of Roseville LLC; Monticello Motors LLC; Jacob Holdings of South Robert Trail LLC; Inver Grove Hyundai LLC; Forest Lake Imports LLC; Den-Star Aviation, Inc.; Jacob Holdings of Inver Grove LLC; Walden Fleet Sales Group, Inc.; Jacob Holdings of Redwood LLC; Jacob Properties of Minnesota LLC; Autocal, LLC; Jacob Holdings of Irvine LLC (which has since been released from the from its guaranty obligations and

{00019285.DOC.2}

grant of security interest under the Guarantor Loan Documents (as defined below)); Autocal South, LLC (which has since been released from the from its guaranty obligations and grant of security interest under the Guarantor Loan Documents); Jacob Holdings of Long Lake Road LLC; Jacob Holdings of Akron Avenue LLC; Rosedale Dodge LLC; Jacob Holdings of Monticello LLC, Sydney Holdings of Monticello LLC (which has since been released from the from its guaranty obligations and grant of security interest under the Guarantor Loan Documents); Jacob Holdings of Sandberg Road LLC; Monticello Ford-Mercury Inc., Inver Grove Motors LLC, Jacob Holdings of Blaine, LLC, and Walden Investment Company (collectively the "Original Guarantors"), in order to induce Lender to make existing and future loans and indebtedness to some or all of the Current Guarantors have executed on October 22, 2004 or on March 1, 2005 or on August 16, 2006 the following loan documents guarantying and securing the repayment of the such indebtedness and loans as defined in the Guarantees referenced below (the "Loans"), and the performance by such Guarantors under such Loans:

1. Amended and Restated All-Encompassing Guaranty;

2. Amended and Restated Guarantor Security Agreement (Multiple Guarantors: Dealership and Non-Dealership Entities);

3. All-Encompassing Guaranty;

4. All Encompassing Guaranty;

5. Guarantor Security Agreement (Multiple Guarantors: Dealership and Non-Dealership Entities);

6. Guarantor Security Agreement (Multiple Guarantors: Dealership and Non-Dealership Entities);

7. First Amendment and Joinder to Guarantor Loan Documents and Consent of Current Guarantors; and

8. Second Amendment and Joinder to Guarantor Loan Documents and Consent of Current Guarantors

WHEREAS, the above noted loan documents, which are each dated October 22, 2004 or March 1, 2005 or August 16, 2006, are referred to herein as the "Guarantor Loan Documents" and are hereby incorporated by reference into this Amendment as the same as if all provisions of the each Guarantor Loan Document was fully set forth.

WHEREAS, the Lender requires that as a condition for the continuation of the Loans and for the funding of a $3,310,000 loan (the "Third Additional Loan") from Lender to New Guarantor, that New Guarantor join in the Guarantor Loan Documents so that (i)

the New Guarantor guarantees (and pledges its assets as security for) the Third Additional Loan and the Loans with the Current Guarantors and (ii) that the Current Guarantors reaffirm their Guaranty of the Loans and confirm that the Third Additional Loan is guaranteed and secured under the Guarantor Loan Documents by their terms.

NOW, THEREFORE, in consideration of the benefits obtained by the New Guarantor and the Current Guarantors, the New Guarantor and the Current Guarantors hereby agree as follows:

1.     All of the above recitals are deemed correct and are hereby acknowledged and incorporated into the agreement of the parties hereto.

2.     The Current Guarantors hereby:  (a) reaffirm and acknowledge their guaranty obligations to Lender and their security interests granted to Lender as established under the Guarantor Loan Documents (which are hereby specifically incorporated by reference into this Amendment); (b) confirm that the obligations and security interests created under such Guarantor Loan Documents by their terms apply to the Third Additional Loan, as and when advanced by Lender; and (c) consent to such Third Additional Loan.   The reaffirmations, acknowledgments, confirmations and consents set forth above are effective, and the Guarantor Loan Documents remain effective as support and security for all of the Loans and the Third Additional Loan, even though the Current Guarantors and the New Guarantor are not (as they have in the past) signing any new or supplemental (other than this Amendment) Guarantor Loan Documents simultaneously with the execution of this Amendment.

4.     The New Guarantor has received and reviewed copies of the Guarantor Loan Documents and the New Guarantor hereby agrees to the terms and conditions of each Guarantor Loan Document which are hereby fully incorporated by reference.

5.     The New Guarantor hereby agrees unconditionally to Lender, its successors and assigns, that the New Guarantor will fully, promptly and faithfully guaranty, perform, pay and discharge all of the "Indebtedness" (as defined in the Guarantor Loan Documents) of each other Guarantor owing to Lender, pursuant to the terms and conditions of said Guarantor Loan Documents.  The New Guarantor hereby joins in the Guarantor Loan Documents as if it was an original party to the Guarantor Loan Documents and agrees to be subject to all terms and conditions of the Guarantor Loan Documents.  The Guarantor Loan Documents are hereby amended so that all references to "Guarantors" shall be deemed to include the New Guarantor as one of the Guarantors.  The agreements set forth above are effective, and the Guarantor Loan Documents are joined into and assumed by New Guarantor as support and security for all of the Loans and the Third Additional Loan, even though the Current Guarantors and the New Guarantor are not (as they have in the past) signing any new or supplemental (other than this Amendment) Guarantor Loan Documents simultaneously with the execution of this Amendment.

6.    Nothing contained herein shall in any way impair the Guarantor Loan Documents or the security now held for the indebtedness thereunder, nor alter, waive, annul, vary or affect any provision, term, condition or covenant therein (except as herein provided), nor affect any rights, powers, privileges, duties or remedies under the Guarantor Loan Documents or any loan documents executed by the Current Guarantors, it being the intent of the Current Guarantors and Lender that the terms and provisions thereof shall continue in full force and effect as previously contained and affirmed hereby.

IN WITNESS WHEREOF, the Current Guarantors and New Guarantor have duly executed this **Third Amendment to Guarantor Loan Documents and Consent of Guarantors** on the day and year first written above.

"GUARANTORS"

_____
Dennis E. Hecker

LAKE COUNTRY AUTO CENTER,
INC., a Minnesota corporation

By: _____
Name: Erik P. Dove
Its    Vice President

WALDEN FLEET GROUP, INC.

By: _____
Name: Erik P. Dove
Its:    Vice President

SOUTHVIEW CHEVROLET CO.,
a Minnesota corporation

By: _____
Name: Erik P. Dove
Its:    Vice President

{00019285.DOC;2}                    - 4 -

ROSEDALE DODGE, INC.,
a Minnesota corporation

By: _____
Name: Erik P. Dove
Its:    Vice President


STILLWATER FORD, LINCOLN-
MERCURY, INC., a Minnesota
corporation

By: _____
Name: Erik P. Dove
Its:    Vice President


HUDSON AUTO SALES, INC.,
a Wisconsin corporation

By: _____
Name: Erik P. Dove
Its:    Vice President


WBDH REALTY, LLP,
a Minnesota limited liability partnership
By:    Walden Investment Company,
        a Minnesota corporation,
        Its General Partner

By: _____
Name: Erik P. Dove
Its:    Vice President


{00019285.DOC;2}                        - 5 -

EDEN PRAIRIE AUTO PROPERTIES,
LLP, a Minnesota limited liability
partnership
By:     WBDH Realty, LLP,
        a Minnesota limited liability
        partnership,
        Its General Partner
    By:  Walden Investment Company,
        a Minnesota corporation,
        Its General Partner

By:
Name: Erik P. Dove
Its:    Vice President


ROSEDALE LEASING LLC,
a Minnesota limited liability company

By:
Name: Erik P. Dove
Its:    Vice President


JACOB HOLDINGS OF ST. LOUIS
PARK LLC, a Minnesota limited liability
company

By:
Name: Erik P. Dove
Its:    Vice President


JACOB HOLDINGS OF BURNSVILLE
LLC, a Minnesota limited liability
company

By:
Name: Erik P. Dove
Its:    Vice President

JACOB HOLDINGS OF STILLWATER
LLC, a Minnesota limited liability
company

By: _____
Name: Erik P. Dove
Its:    Vice President


JACOB HOLDINGS OF HUDSON LLC,
a Minnesota limited liability company

By: _____
Name: Erik P. Dove
Its:    Vice President


JACOB HOLDINGS OF ROSEVILLE
LLC, a Minnesota limited liability
company

By: _____
Name: Erik P. Dove
Its:    Vice President


JACOB HOLDINGS OF FOREST LAKE
LLC, a Minnesota limited liability
company

By: _____
Name: Erik P. Dove
Its:    Vice President

{00019285.DOC.2}

WALDEN PROPERTIES OF FOREST
LAKE, LLP, a Minnesota limited liability
partnership

By:    Walden Investment Company,
       a Minnesota corporation,
       Its General Partner

By: _____
Name: Erik P. Dove
Its:    Vice President


MONTICELLO MOTORS LLC,
a Minnesota limited liability company

By: _____
Name: Erik P. Dove
Its:    Vice President


JACOB HOLDINGS OF SOUTH
ROBERT TRAIL LLC, a Minnesota
limited liability company

By: _____
Name: Erik P. Dove
Its:    Vice President


INVER GROVE HYUNDAI LLC, a
Minnesota limited liability company

By: _____
Name: Erik P. Dove
Its:    Vice President


FOREST LAKE IMPORTS LLC,
a Minnesota limited liability company

By: _____
Name: Erik P. Dove
Its:    Vice President

JACOB HOLDINGS OF INVER
GROVE LLC, a Minnesota limited
liability company

By: _____
Name: Erik P. Dove
Its:   Vice President


DEN-STAR AVIATION, INC.,
a Minnesota corporation

By: _____
Name: Erik P. Dove
Its:   Vice President


WALDEN FLEET SALES GROUP, INC.
a Minnesota corporation

By: _____
Name: Erik P. Dove
Its:   Vice President


JACOB HOLDINGS OF REDWOOD
LLC, a Minnesota limited liability
company

By: _____
Name: Erik P. Dove
Its:   Vice President


JACOB PROPERTIES OF MINNESOTA
LLC, a Minnesota limited liability
company

By: _____
Name: Erik P. Dove
Its:   Vice President

AUTOCAL, LLC
a California limited liability company

By: _____
Name: Dennis E. Hecker
Its:    Manager


JACOB  HOLDINGS  OF  LONG  LAKE
ROAD LLC, a Minnesota limited liability
company

By: _____
Name: Erik P. Dove
Its:    Vice President


JACOB HOLDINGS OF AKRON
AVENUE LLC, a Minnesota limited
liability company

By: _____
Name: Erik P. Dove
Its:    Vice President


ROSEDALE DODGE LLC,
a Minnesota limited liability company

By: _____
Name: Erik P. Dove
Its:    Vice President


JACOB  HOLDINGS  OF  MONTICELLO
LLC,   a   Minnesota   limited   liability
company

By: _____
Name: Erik P. Dove
Its:    Vice President

JACOB HOLDINGS OF SANDBERG
ROAD LLC, a Minnesota limited liability
company

By: _____
Name: Erik P. Dove
Its:   Vice President


MONTICELLO FORD-MERCURY INC.,
a Minnesota corporation

By: _____
Name: Erik P. Dove
Its:   Vice President


INVER GROVE MOTORS LLC,
a Minnesota limited liability company

By: _____
Name: Erik P. Dove
Its:   Vice President


WALDEN INVESTMENT COMPANY,
a Minnesota corporation

By: _____
Name: Erik P. Dove
Its:   Vice President


JACOB HOLDINGS OF BLAINE LLC,
a Minnesota limited liability company

By: _____
Name: Erik P. Dove
Its:   Vice President


JACOB HOLDINGS OF TEXAS LLC,
a Minnesota limited liability company

By: _____
Name: Erik P. Dove
Its:   Vice President

STATE OF MINNESOTA   )
                              ) SS.
COUNTY OF HENNEPIN       )

The foregoing instrument was acknowledged before me this /st day of March, 2007,
by Dennis E. Hecker, individually and as Manager of Autocal, LLC, a California  limited
liability company of and on behalf of each company.



_____
Notary Public
Hennepin County,
State of Minnesota
My Commission Expires:

STATE OF MINNESOTA        )
                              ) SS.
COUNTY OF HENNEPIN        )

    The foregoing instrument was acknowledged before me this /st  day of March,
2007 by Erik P. Dove, in his capacity as Vice President of the above limited liability
companies, corporations and partnerships of and on behalf said companies,
corporations and partnerships.

_____
Notary Public
Hennepin County,
State of Minnesota
My Commission Expires:

{00019285.DOC.2}                    - 12 -

**LOAN AGREEMENT**

**BY AND BETWEEN**

**JACOB HOLDINGS OF UPNORTH LLC**

**AND**

**HYUNDAI MOTOR FINANCE COMPANY**

**$2,300,000.00**

**DATED AS OF  DECEMBER 28, 2007**

CHICAGO/#1726252.6

# TABLE OF CONTENTS

**Page**

ARTICLE I     DEFINITIONS .................................................................................. 1

    Section 1.01    Definitions ............................................................... 1
    Section 1.02    Reference ................................................................. 1

ARTICLE II    LOAN AND SECURITY ............................................................. 1

    Section 2.01    Agreement to Borrow and Lend ................................. 1
    Section 2.02    Use of Proceeds ....................................................... 1
    Section 2.03    Payments of Principal and Interest ............................ 2
    Section 2.04    Prepayments ............................................................ 3

ARTICLE III   CONDITIONS PRECEDENT TO LOAN ................................... 3

    Section 3.01    Deliveries Prior to Closing Date ............................... 3

ARTICLE IV   RESERVES .................................................................................. 5

    Section 4.01    Setting Up and Adjusting Reserves ........................... 5
    Section 4.02    Disbursement of Reserves ........................................ 5
    Section 4.03    No Interest Payable on Reserves ............................... 5
    Section 4.04    Application of Reserves in Case of Default ................ 5

ARTICLE V    OBLIGATIONS ABSOLUTE ..................................................... 6

    Section 5.01    Obligations of Borrower .......................................... 6

ARTICLE VI   REPRESENTATIONS AND WARRANTIES .............................. 6

    Section 6.01    Representations and Warranties ................................ 6
    Section 6.02    Representations and Warranties Generally ................ 9

ARTICLE VII  AFFIRMATIVE COVENANTS ................................................. 10

    Section 7.01    Affirmative Covenants of Borrower .......................... 10
    Section 7.02    Financial Statements ................................................ 10
    Section 7.03    Conduct of Business ................................................ 11
    Section 7.04    Maintenance of Insurance ........................................ 11
    Section 7.05    Visitation Rights ...................................................... 11
    Section 7.06    Maintenance of Properties ........................................ 11
    Section 7.07    Compliance with ERISA .......................................... 11
    Section 7.08    Recording and Filing of Mortgages and Financing Statements ........ 12
    Section 7.09    Payment of Indebtedness .......................................... 12
    Section 7.10    Performance of Obligations ...................................... 12
    Section 7.11    Liens, Charges, Imposts ........................................... 12

ARTICLE VIII  NEGATIVE COVENANTS ....................................................... 13

    Section 8.01    Negative Covenants of Borrower ............................... 13

i

# TABLE OF CONTENTS
(continued)

Page

Section 8.02    Amendment to Agreements ................................................. 13
Section 8.03    Prohibition of Assignments and Encumbrances by Borrower .......... 13
Section 8.04    Disposal of Property ....................................................... 14
Section 8.05    Transactions with Affiliates .............................................. 14
Section 8.06    Maintain Existence, Merger, Etc ........................................ 14
Section 8.07    Sale and Lease-Back ...................................................... 14
Section 8.08    Purchase or Lease of Materials ......................................... 15
Section 8.09    Debt........................................................................ 15
Section 8.10    Guaranties ................................................................. 15
Section 8.11    Line of Business........................................................... 15

ARTICLE IX    EVENTS OF DEFAULT, REMEDIES UPON DEFAULT ...................... 15

Section 9.01    Events of Default ......................................................... 15
Section 9.02    Remedies Conferred upon Lender ....................................... 17
Section 9.03    Right of Lender to Make Advances to Cure Defaults;
                Obligatory Advances ..................................................... 18
Section 9.04    Attorneys' Fees ........................................................... 18
Section 9.05    No Waiver .................................................................. 18
Section 9.06    Default Rate ............................................................... 19

ARTICLE X    BORROWER'S INDEMNITY ................................................. 19

Section 10.01    Borrower's Indemnity .................................................. 19

ARTICLE XI    MISCELLANEOUS ......................................................... 20

Section 11.01    Amendments, Etc....................................................... 20
Section 11.02    Right of Set-off ........................................................ 20
Section 11.03    Continuing Obligation ................................................. 20
Section 11.04    Liability of Lender ..................................................... 20
Section 11.05    Lender's Right to Assign .............................................. 21
Section 11.06    Costs, Expenses and Taxes ............................................ 21
Section 11.07    Notices .................................................................. 21
Section 11.08    Severability ............................................................. 22
Section 11.09    Governing Law; Jury Trial Waiver; Venue ......................... 23
Section 11.10    Headings ................................................................ 23
Section 11.11    Approval or Consent of Lender ....................................... 24

CHICAGO/#1726252.6

## LOAN AGREEMENT

THIS **LOAN AGREEMENT** (this "Agreement") is made this 28th day of December, 2007, by and between **JACOB HOLDINGS OF UPNORTH LLC**, a Minnesota limited liability company (the "Borrower"), and **HYUNDAI MOTOR FINANCE COMPANY**, a California corporation (the "Lender").

**WHEREAS**, Borrower has applied to Lender for a loan for the purpose of refinancing an automobile dealership and associated parking facilities and making certain improvements (the "Project") on a portion of the land located at and commonly known as 166042 State Highway 371, Baxter, Minnesota 56401-6925 as legally described on Exhibit A attached hereto (the "Property").

**WHEREAS**, in reliance upon the representations made by Borrower, and subject to the terms and conditions of this Agreement, Lender has agreed to make a loan to Borrower in the original principal amount of TWO MILLION THREE HUNDRED THOUSAND DOLLARS ($2,300,00.00) (the "Loan").

**NOW, THEREFORE**, in consideration of the premises and in order to induce Lender to make the Loan, Borrower and Lender hereby agree as follows:

### ARTICLE I

### DEFINITIONS

Section 1.01 Definitions. As used in this Agreement, capitalized words and phrases shall have the meanings set forth in Annex I attached hereto and made a part hereof.

Section 1.02 Reference. Whenever reference is made in this Agreement to a written agreement or instrument, such reference shall be deemed to mean such agreement or instrument together with all amendments, modifications, and restatements thereof.

### ARTICLE II

### LOAN AND SECURITY

Section 2.01 Agreement to Borrow and Lend. Borrower agrees to borrow from Lender, and Lender agrees to lend to Borrower, the Loan on the terms of and subject to the conditions of this Agreement.

Section 2.02 Use of Proceeds. Upon satisfaction of all of the terms and conditions to Lender's disbursement obligations set forth in this Agreement, Lender will disburse the proceeds of the Loan as herein provided for the refinance of the Property and making certain improvements.

Section 2.03   Payments of Principal and Interest.

      (a)     The Loan shall be evidenced by the Note.

      (b)     Interest on funds advanced under the Note shall:

            (i)     accrue at the Interest Rate, subject to Section 9.06;

            (ii)     be computed upon advances of the Loan from and including the date of each advance by Lender to or for the account of Borrower (whether to an escrow account or otherwise), on the basis of a three hundred sixty (360) day year and the actual number of days elapsed in any portion of a month in which interest is due; and

            (iii)     be paid by Borrower to Lender in the manner and at all times set forth herein.

      (c)     Commencing on February 1, 2008 and continuing on the same date each month thereafter until the Maturity Date, Borrower shall make payments of (i) the outstanding principal balance of the Loan computed in such amounts necessary as determined by Lender to amortize such amount in full over a twenty (20) year term plus (ii) interest computed on the outstanding principal balance of the Loan at the Interest Rate paid in arrears as provided for herein.

      (d)     The Borrower shall pay the outstanding principal amount in full as well as any and all accrued interest and unpaid costs and expenses on or before the Maturity Date.

      (e)     All payments by Borrower to Lender hereunder and under the Loan Documents shall be made in lawful currency of the United States and in immediately available funds at the principal office of Lender.  Any payment due on a day which is not a Business Day shall be due and payable on the next succeeding Business Day.

      (f)     If Borrower does not pay, within five (5) days of when due, any amount payable pursuant to this Agreement or the Loan Documents, Borrower shall pay to Lender, at Lender's option, (i) interest on such overdue amount at a per annum rate equal to the Default Rate from the date when such amount was due plus (ii) a late charge equal to five percent (5%) of the amount of such late payment.  The "late charge" is imposed for the purpose of defraying the expenses of the Lender incident to handling such delinquent payment.  This charge shall be in addition to, and not in lieu of, any other remedy Lender may have and is in addition to any fees and charges of any agents or attorneys which Lender may employ upon the occurrence of an Event of Default, whether authorized herein or by law.  Borrower will pay this late charge only once per late payment.

      (g)     If, for any reason, adequate means do not exist for ascertaining the Three Month LIBOR Rate, the per annum rate of interest shall be determined by Lender in its reasonable discretion.  Upon each subsequent increase or decrease in the Three Month

CHICAGO/#1726252.6

LIBOR Rate, the Interest Rate shall be increased or decreased by the same amount as the increase or decrease in the Three-Month LIBOR Rate, effective on the first (1st) business day of the next monthly interest billing period.

(h)    Payments will be applied, at Lender's option, first to any fees, expenses or other costs (including the funding of any reserves required under this Agreement or the other Loan Documents) Borrower is obligated to pay under this Agreement or the other Loan Documents, second to interest due on the unpaid principal balance of the Note outstanding from time to time, and third to the outstanding principal balance of the Note.

Section 2.04  Prepayments.  Borrower may prepay all or any portion of the Loan at any time on ten (10) days' advance notice to Lender provided that in addition to all principal, interest, costs and expenses owing at the time of such prepayment, Borrower pays a prepayment premium (the "Prepayment Premium") if (a) prepayment is made more than forty-eight (48) months prior to the Maturity Date, in an amount equal to three percent (3.0%) of the principal amount so prepaid, (b) prepayment is more than thirty-six (36) months prior to the Maturity Date but less than or equal to forty-eight (48) months prior to the Maturity Date, in an amount equal to two percent (2.0%) of the principal amount so prepaid, and (c) prepayment is more than twenty-four (24) months prior to the Maturity Date, but less than or equal to thirty-six (36) months prior, in an amount equal to one percent (1.0%) of the principal amount so prepaid.  All prepayment and principal shall be applied to the scheduled installments of principal in their inverse order of maturity.  In no event shall the Prepayment Premium be less than zero.  Notwithstanding the foregoing, no partial prepayment shall postpone the due date of any monthly payment hereunder or, solely as a result of such partial prepayment, reduce the amount of any monthly payment due hereunder, unless otherwise agreed to in writing by Lender.  No Prepayment Premium shall apply to any insurance proceeds or condemnation proceeds received by Lender.

Section 2.05  Holdback.  A portion of the Loan Proceeds in an amount determined by Lender (the "Holdback") shall be retained by Lender as a holdback for the costs and expenses incurred in connection with certain capital improvements to the Property ("Project Renovation") as or as otherwise approved by Lender.  On or before the Closing Date, Borrower shall submit to Lender with a copy to the Title Company, for approval by Lender and its independent consultant, a description of the Project Renovation including a schedule for completion ("Holdback Completion Schedule") and a construction budget (the "Holdback Budget").  Absent a default hereunder or under any of the other Loan Documents, Lender shall make disbursements of portions of the Holdback subject to the following conditions:

(a)    At least five (5) business days prior to the date of any such advance, Borrower shall provide Lender and Title Company with a written request for payment executed by Borrower together with copies of invoices, lien waivers, applications for payments, canceled checks, or other evidence of payment of amounts due and payable by Borrower in connection with the Project Renovation and a certificate of completion reasonably acceptable to Lender;

(b)    Lender shall have received, at Borrower's expense, an endorsement to the Loan Policy insuring the priority of the Mortgage with respect to such advance and indicating that no intervening liens exist against the Project;

3

(c)  Lender shall have approved the Project Renovation, the Holdback Completion Schedule and the Holdback Budget;

(d)  Borrower shall have delivered evidence satisfactory to Lender, in its sole discretion, that the Holdback is sufficient to complete the Project Renovation or, if insufficient, Borrower shall have pay additional funds necessary to complete the Project Renovation (Borrower's deposit to be disbursed before any balance of the Holdback);

(e)  At Lender's option, Lender's independent consultant may inspect the Project Renovation;

(f)  Such advances shall be made no more than once a month in minimum amounts of $25,000.00 with the final advance to be made no later than two (2) months after the Closing Date; and

(g)  Such advances shall be utilized to pay the actual costs of the Project Renovation as portions of same are completed and shall be made by Lender through a construction escrow established with the Title Company, at Borrower's expense.

## ARTICLE III

## CONDITIONS PRECEDENT
## TO LOAN

Section 3.01 <u>Deliveries Prior to Closing Date</u>. As a condition precedent to the Loan, Borrower shall furnish the following to Lender on or before the Closing Date in form and substance satisfactory to Lender:

(a)  true and correct copies of all governmental approvals, if any, necessary for Borrower to enter into this Agreement, the Loan Documents and the transactions contemplated by this Agreement, together with certified copies of all approvals, authorizations, or consents of or notices to or registrations with, any governmental body or agency required therefor;

(b)  an opinion of counsel to Borrower in form and substance satisfactory to Lender and its counsel;

(c)  an executed copy of this Agreement;

(d)  the original executed Note;

(e)  an executed copy of each of the Mortgage, the Environmental Indemnity Agreement, and the Guaranty;

(f)  the Financing Statements;

(g)  an executed copy of the Lease reflecting a minimum five (5) year term;

4

(h)    evidence satisfactory to Lender and its counsel that all liens and security interests are of first priority, subject only to Permitted Encumbrances;

(i)    an executed copy of the Subordination Agreement;

(j)    an executed copy of the Estoppel Certificate;

(k)    an ALTA Loan Policy (2006) issued by the Title Company or such other title insurance company as Lender shall select, in the full amount of the Loan, naming Lender as insured, insuring the lien of the Mortgage to be a valid first, prior and paramount lien upon the fee title to the Property (the "Loan Policy") subject only to Permitted Encumbrances and such endorsements as Lender shall reasonably direct, all of which endorsements shall be in such form as approved by Lender (collectively, the "Endorsements");

(l)    A survey acceptable to the Title Company to issue any survey endorsements requested by Lender to the Loan Policy, of the real estate and improvements described in the Mortgage, certified and satisfactory to Lender in its sole discretion, reflecting no survey defects which are not Permitted Encumbrances;

(m)    an appraisal addressed to Lender dated no more than six (6) months prior to the Closing Date prepared by a certified or licensed appraiser who is approved by Lender which shall be in form and substance satisfactory to Lender in its sole discretion;

(n)    the Environmental Report addressed to Lender dated no more than six (6) months prior to the Closing Date and such additional reports and other documents pertaining to environmental conditions related to the Property, all of which shall be in form and substance satisfactory to Lender in its sole discretion;

(o)    evidence of insurance conforming to the requirements hereof and of the Loan Documents, naming Lender as mortgagee, lender's loss payee and additional insured;

(p)    evidence of appropriate zoning for the Property and copies of all necessary Permits; and

(q)    such other documents, instruments, approvals (and, if requested by Lender, certified duplicates of executed copies thereof) or opinions as Lender may reasonably request, or re-execution of existing documents or instruments.

Upon receipt by Lender of all items set forth in this Section 3.01, Lender shall cause the Mortgage, the Subordination Agreement and Financing Statements to be deposited with the Title Company. Lender, through its counsel, shall direct the Title Company to record the Mortgage, the Subordination Agreement and Financing Statements only when the Title Company is prepared to issue the Loan Policy.

CHICAGO/#1726252.6

# ARTICLE IV

## RESERVES

Section 4.01 <u>Setting Up and Adjusting Reserves</u>.  Upon an Event of Default and not less than ten (10) days prior notice to Borrower, Lender may pay from the proceeds of the Loan all Loan Expenses, to the extent the same have not been previously paid.  Upon an Event of Default, Lender may also designate reserves (the "<u>Reserves</u>") at which time Borrower shall deposit such Reserve amount with Lender within five (5) business days after notice from Lender and thereafter from time to time Lender may in its reasonable discretion require Borrower to increase the amount of such Reserves as circumstances may require for any or all of the following purposes to cover the actual or estimated amounts required for such purposes until the Maturity Date of the Loan:

(a)    All unpaid Loan Expenses and Lender's counsel fees;

(b)    An amount, as estimated by Lender, for real estate taxes which will accrue prior to the Maturity Date of the Loan, and for tax deposits, if any, required by the Mortgage; and

(c)    An amount, as estimated by Lender, for premiums on insurance policies required to be furnished by Borrower hereunder, payable prior to the Maturity Date of the Loan and for insurance deposits, if any, required by the Mortgage.

Section 4.02 <u>Disbursement of Reserves</u>.  Provided that no Event of Default is continuing hereunder, Borrower may direct Lender to disburse the Reserves for the respective purposes for which they have been set aside, either by payment of items for which the Reserves have been set aside, or by reimbursement to Borrower for payments so made by Borrower.

Section 4.03 <u>No Interest Payable on Reserves</u>.  No interest shall accrue upon Reserves held by Lender until disbursement thereof, whereupon such disbursement shall be deemed to be a disbursement of proceeds of the Loan.  Payments by Lender into an escrow or title indemnity or otherwise for the benefit of Borrower or to satisfy any requirements of the Title Company shall be deemed a disbursement.

Section 4.04 <u>Application of Reserves in Case of Default</u>.  In case of an Event of Default, Lender may use and apply Reserves or any monies deposited by Borrower with Lender, regardless of the purpose for which deposited, to cure such Event of Default or to apply as a prepayment of the Loan in Lender's sole discretion.

## ARTICLE V

## OBLIGATIONS ABSOLUTE

Section 5.01 <u>Obligations of Borrower</u>.    The obligations of Borrower under this Agreement shall be absolute, unconditional and irrevocable and shall be paid and performed strictly in accordance with the terms of this Agreement, under all circumstances whatsoever, including, without limitation, the following circumstances:

6

CHICAGO/#1726252.6

(a)    any lack of validity or enforceability of this Agreement or the Loan Documents;

(b)    any amendment or waiver of, or any consent to departure from, all or any of this Agreement or the Loan Documents;

(c)    the existence of any claim, set-off, defense or other rights which Borrower may have at any time against Lender or any other person or entity, whether in connection with this Agreement, the Loan Documents or any unrelated transaction; or

(d)    any other circumstance or happening whatsoever, whether or not similar to any of the foregoing.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES

Section 6.01 <u>Representations and Warranties</u>.  Borrower hereby covenants, represents and warrants to Lender as follows:

(a)    <u>Authority</u>.  Borrower has full right, power and authority to execute, deliver and carry out the terms and provisions of the Loan Documents and any other documents and instruments to be executed and delivered by Borrower pursuant to this Agreement. The Loan Documents and any other documents and instruments to be executed and delivered by Borrower pursuant to this Agreement, when executed and delivered pursuant hereto, will constitute the duly authorized, valid and legally binding obligations of Borrower and will be enforceable strictly in accordance with their respective terms, subject to the effect of bankruptcy and other laws affecting the rights of creditors generally.

(b)    <u>No Default</u>.  To the best of Borrower's knowledge, Borrower is not in default under any contract, agreement or commitment to which it is a party, the effect of which would adversely affect Borrower's performance of its obligations pursuant to and as contemplated by the terms and provisions of this Agreement.  To the best of Borrower's knowledge, the execution and delivery of the Loan Documents and any other documents or instruments to be executed and delivered by Borrower, or both, pursuant hereto, the consummation of the transactions herein or therein contemplated, and compliance with the terms and provisions hereof or thereof, will not (i) violate any presently existing provisions of law or any presently existing applicable regulation, order, writ, injunction or decree of any court or governmental department, commission, board, bureau, agency or instrumentality, or (ii) conflict or be inconsistent with, or result in any breach of, any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in any acceleration of any obligations under, any indenture, mortgage, deed of trust, instrument, documents, agreement or contract of any kind to which Borrower is a party or by which the Property or Borrower may be bound.

(c)    <u>No Litigation</u>.  There are no petitions, actions, suits or proceedings pending or, to the best of Borrower's knowledge, threatened against or affecting the

CHICAGO/#1726252.6

Property or Borrower, or both of them, before any court or governmental, administrative, regulatory, adjudicatory or arbitrational body or agency of any kind, which if adversely determined would materially affect Borrowers ability to fulfill its obligation herein.

(d)    <u>True and Complete Information</u>.  Neither this Agreement, nor any other Loan Document, nor any document, financial statement, credit information, certificate or other statement required herein furnished to Lender by Borrower or Guarantor contains any untrue statement of a material fact or omits to state a material fact relating to the Property or any matter covered by this Agreement.   To the best of Borrower's knowledge, no document, financial statement, credit information, certificate or other statement prepared by any party other than Borrower or Guarantor and furnished to Lender contains any untrue statement of a material fact or omits to state a material fact relating to this Agreement.  There is no fact that Borrower has not disclosed to Lender in writing that could materially adversely affect the property, business or financial condition of Borrower, Guarantor, the Property or the Project.

(e)    <u>Usury</u>.  To the best of Borrower's knowledge, the amounts to be received by Lender as interest under the Note are not usurious or illegal under applicable law.

(f)    <u>Non Foreign Status</u>.  Borrower is not a nonresident alien for purposes of U.S. income taxation and is not a foreign corporation, foreign partnership, foreign trust or foreign estate (as said terms are defined in the Internal Revenue Code and Income Tax Regulations).

(g)    <u>ERISA</u>.  Borrower is not and, for so long as any obligation of Borrower hereunder remains outstanding, shall not be an "employee benefit plan" within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended, and Borrower's assets do not constitute assets of any such plan.

(h)    <u>RICO</u>.  There are no suits, actions or proceedings pending or to the best of Borrower's knowledge, threatened against Borrower, any of Borrower's Affiliates, or Guarantor under a RICO Related Law, which if adversely determined would materially affect Borrowers ability to fulfill its obligation herein.

(i)    <u>Financial Statements</u>.  The Borrower and Guarantor have heretofore furnished to Lender the Borrower's and Guarantor's financial statements ("<u>Financial Statements</u>").  Such financial statements present fairly the financial condition of the Borrower and Guarantor as of the date thereof.  Since the date of such financial statements, there has been no Material Adverse Change in the Borrower and Guarantor's business or financial condition not disclosed in writing to Lender.  The Borrower has no contingent liabilities not provided for or disclosed in said financial statements, except as disclosed in writing to Lender.  Each of the Borrower and Guarantor has the financial capacity to perform and discharge each and every one of its respective obligations and liabilities under this Agreement and any of the other Loan Documents as it becomes due.

8

(j)    Title.  Borrower has good, marketable and indefeasible title in fee simple to the Property, subject to no liens, claims, encumbrances, rights of others, conditions or exceptions other than the Permitted Exceptions.

(k)    Utilities.  All water, storm and sanitary sewer facilities and utility services necessary and sufficient for the use of the Project are available at the Property.

(l)    Intentionally Deleted.

(m)    Zoning.  The Property is duly and validly zoned for the use of the entire Project.  Said zoning is unconditional, in full force and effect and no attacks or challenges are pending or threatened with respect thereto.  Neither said zoning nor any other right to use the Property is in any way dependent upon or related to any real estate other than the Property.

(n)    Condemnation.  Borrower has not received any notice from any governmental or quasi-governmental body or agency or from any person or entity with respect to, and to the best of Borrower's knowledge, there is no actual or threatened taking of the Property, or any portion thereof, for any public or quasi-public purpose by the exercise of the right of condemnation or eminent domain.

(o)    Roads.  The Property is bounded by public streets, each of which is a completed, publicly dedicated street to which the Property (and all users thereof) have and shall have complete, unencumbered and unrestricted access, except that vehicular access shall be limited to those locations along public streets at which curb cuts shall be permitted by the municipality.  Public streets are sufficient and fully available for the full utilization of the Property for its intended purposes, including, without limitation, the construction and installation and the use and enjoyment of the Project.

(p)    Compliance With Laws and Other Requirements.  Neither the Project nor the use of the Project violates or will violate any presently existing applicable statute, law, regulation, rule, ordinance or order of any kind whatsoever (including, without limitation, any presently existing zoning or building laws or ordinances, any presently existing environmental protection laws or regulations, any presently existing rules, regulations or orders of any governmental agency or any agreements with, or regulations or requirements of, the municipality applicable to the Project), or any building permit issued with respect to the Project or any condition, easement, right-of-way, covenant or restriction of record affecting the Property.

(q)    ADA Compliance.  The Project has been designed and shall be maintained during the period of Borrower's ownership thereof in strict accordance and full compliance with all of the requirements of the ADA and any similar state or local law, to the extent same are applicable.  Borrower shall be responsible for all related compliance costs.

(r)    Flood Plain and Wetlands.  No portion of the Property or the Project is located (i) in an area designated by FEMA as a Special Flood Hazard Area, (ii) in an area classified as "wetlands" or (iii) in an area designated by any federal, state or local

9

governmental or quasi-governmental agency as a "floodway," special flood hazard area or flood plain, except as disclosed on the survey dated August 8, 2007 prepared by Kramer Lease Delco.

(s)    <u>Agreements Affecting the Property</u>.    Borrower has not entered into any and, there are no leases or tenancies affecting the Property except the Lease as to which Borrower has heretofore furnished Lender true and complete copies, and no contracts or agreements relating to the maintenance, development or management of the Property, except those as to which Borrower has heretofore furnished Lender true and complete copies.

(t)    <u>Brokerage Commissions</u>.    No brokerage fees or commissions are payable by Borrower in connection with the Property or the Loan.

(u)    <u>Loan Purposes</u>.    The Loan is not being made for the purpose of purchasing or carrying margin stocks, and Borrower agrees to execute, or cause to be executed, all instruments necessary to comply with all of the requirements of Regulation U of the Federal Reserve System.    The Loan is an exempt transaction under the Truth-in-Lending Act.

(v)    <u>Formation</u>.    Borrower is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Minnesota.    Borrower has furnished Lender with a true and complete copy of its Articles of Organization and its Operating Agreement and shall not modify or amend neither its Articles of Organization nor its Operating Agreement without the prior written consent of Lender, except as allowed herein.

Section 6.02 <u>Representations and Warranties Generally.</u>    The representations and warranties set forth in this Article VI and elsewhere in this Agreement or in any other Loan Document will be true and correct on the Closing Date.    All representations, warranties, covenants and agreements made in this Agreement or in any certificate or other document delivered to Lender by or on behalf of Borrower pursuant to or in connection with this Agreement shall be deemed to have been relied upon by Lender notwithstanding Lender's review of any documents or materials delivered by Borrower to Lender pursuant to the terms hereof and notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf (and Borrower hereby acknowledges such reliance by Lender in making the Loan and all disbursements thereunder) and, furthermore, shall survive the making of any or all of the disbursements of proceeds of any of the Loan contemplated hereby and continue in full force and effect as long as there remain unperformed any obligations to Lender hereunder or under any of the other Loan Documents.

## ARTICLE VII

## AFFIRMATIVE COVENANTS

Section 7.01 <u>Affirmative Covenants of Borrower</u>.    Until the Maturity Date and thereafter until no amount is due or owing to Lender hereunder, Borrower shall comply with each of the

10

covenants, undertakings and agreements set forth in this Article VII unless Lender shall otherwise consent in writing.

Section 7.02 Financial Statements.    Borrower will keep proper books of record and account in accordance with GAAP in which full and true entries will be made of all dealings or transactions of or in relation to the business and affairs of Borrower including, without limitation, the Project and the Property, and Borrower shall cause to be furnished to Lender:

(a)    As soon as available, but in no event later than April 30 of the year immediately following the reporting year, financial statements for Borrower and Guarantor, prepared in accordance with GAAP (except for personal financial statements for Dennis E. Hecker which shall be provided no later than October 1st of each year), which financial statements shall include but not be limited to a balance sheet, income statement and statement of cash flows for Borrower for the preceding fiscal year to be delivered, and shall show the financial position of Borrower and Guarantor at the end of such fiscal year and Borrower's results of operations at the end of such fiscal year, accompanied by a written representation and warranty signed by the Chief Financial Officer of Borrower, to the effect that such financial statements are true, correct and complete in all material respects (i) they have not become aware of any Event of Default or Unmatured Event of Default that has occurred and is continuing or, if they have become aware of any such event, describing it and the steps, if any, being taken to cure it, and (ii) they are aware that Lender is relying upon such certification of such annual financial statements and they authorize such reliance;

(b)    Prompt (and in any event within ten (10) days) notice of (i) any Material Adverse Change of Borrower; (ii) any Event of Default or Unmatured Event of Default under this Agreement or any of the Loan Documents; (iii) any event of default or default or any event, the occurrence or nonoccurrence of which constitutes, or which with the giving of notice or the passage of time or both would constitute, an event of default or default under any agreements to which Borrower is a party or by which Borrower or any of its properties may be bound; or (iv) any proceedings instituted or to be instituted by or against Borrower;

(c)    Within 30 days of filing, Borrower's and Guarantor's federal, state and local income tax returns as soon as said returns are completed (but not later than 30 days after the date on which the returns required are to be filed in accordance with the rules and regulations of the Internal Revenue Service)  in the form said returns will be filed with the Internal Revenue Service and any state or local department of revenue or taxing authority; and

(d)    From time to time such certificates, reports, statements and documents relating to legal aspects or matters contemplated by this Agreement or further information regarding the business or financial condition of Borrower or Guarantor, as Lender may reasonably require, including, without limitation, monthly balance sheets and income statements, periodic accounts receivable reconciliations, monthly accounts receivable and accounts payable aging statements, monthly schedules of inventories.

11

Section 7.03  Conduct of Business.  Borrower shall maintain in full force and effect all permits, licenses, franchises, leases, patents, contracts and other rights necessary to the proper conduct of its business and will comply and cause the Project to comply with all applicable laws and regulations of any federal, state or local governmental authority.

Section 7.04  Maintenance of Insurance.  Borrower shall maintain all insurance required to be maintained under the Loan Documents and, to the extent not required by the Loan Documents, shall maintain insurance with responsible and reputable insurance companies reasonably acceptable to Lender covering such risks ordinarily insured against by other owners or users of properties similar to the Property and Project or in similar businesses including, without limitation, builder's risk completed value coverage in an amount equal to the full replacement value of the improvements to be constructed on the Property and general commercial liability in an amount reasonably determined by Lender, so long as commercially available at reasonable cost under the circumstances as determined by Lender in its sole discretion (each such policy may be less any deductible or co-insurance deemed reasonable by Lender).  Lender shall be named as mortgagee and lender's loss payee on all risk property/casualty coverage insurance and as an additional insured on all general liability policies. Borrower shall furnish to Lender on an annual basis evidence of all such insurance acceptable to Lender.

Section 7.05  Visitation Rights.  Upon at least twenty-four (24) hours prior oral or written notice, during customary business hours, Borrower shall permit Lender or any agents or representatives thereof to visit the site of the Project and other properties of Borrower, inspect the books and records of Borrower, and discuss the general business affairs of Borrower with its senior management.

Section 7.06  Maintenance of Properties.  Borrower shall maintain and preserve all of its properties which are used or which are useful in the conduct of its business clean and sightly and in good working order, repair and condition, ordinary wear and tear excepted.

Section 7.07  Compliance with ERISA.  Borrower shall continue to satisfy the minimum funding standards under ERISA with respect to its plans.  Borrower is in compliance and will remain in compliance in all respects with other presently applicable provisions of ERISA, the noncompliance with which would in the aggregate, have a Material Adverse Change on the business, financial position or results of operations of Borrower.

Section 7.08  Recording and Filing of Mortgages and Financing Statements.  Borrower shall, at its sole expense, cause the Mortgage and Financing Statements with respect to the Property to be properly filed or recorded in all places where such filing or recording is necessary or desirable to perfect and maintain perfection of the lien and security interest of Lender in the Property and the other property in which a security interest is granted under this Agreement, the Mortgage or any of the other Loan Documents and shall, at its sole expense, do all things necessary by way of any additional filings to continue and maintain the lien and priority of such security interests.

Section 7.09  Payment of Indebtedness.  Borrower shall pay any Indebtedness for which it is liable when due and shall not permit any default to occur under any document evidencing or

12

securing any such Indebtedness; provided, however, that Borrower may withhold payment of Indebtedness if it, in good faith, asserts that such Indebtedness is not then due and owing.

Section 7.10 <u>Performance of Obligations</u>.    Borrower shall observe and perform its obligations under this Agreement, the Loan Documents and the other agreements relating to the transaction contemplated hereby to which it is a party or by which it is bound and shall not suffer or permit any default or Event of Default to exist hereunder or thereunder.    Borrower shall deliver or cause to be delivered notices and documents required by the Loan Documents to be delivered to Lender and cause all parties to observe and perform those obligations and covenants contained in the Loan Documents required to be observed and performed for the benefit of Lender.

Section 7.11 <u>Liens, Charges, Imposts</u>.

(a)    Except for Permitted Encumbrances, Borrower shall not create, incur, assume or suffer to exist any mortgage, pledge or other lien, charge or encumbrance of any kind or character upon the Property or any other property, real, personal or mixed, which is encumbered by any of the Loan Documents, whether such property is owned on the date hereof or hereafter acquired, and Borrower shall, upon request of Lender, from time to time furnish Lender with satisfactory evidence (including searches of public records) of the fact that all such property is the property of Borrower, as the case may be, free and clear of all encumbrances other than the Permitted Encumbrances.

(b)    Without limiting the provisions of paragraph (a) of this Section, Borrower shall not suffer or permit to exist any mechanics' lien claims to be asserted against the Property or any funds due any contractor and shall within thirty (30) days after filing discharge same in the event of the filing thereof; provided, however, that nothing herein contained shall prohibit Borrower from contesting any such liens or claims for lien in good faith if Borrower shall have furnished the Title Company with such security or indemnity as the Title Company requires in order to insure over or against loss or damage from such contested lien or claim for lien, and the Title Company shall have issued to Lender an endorsement insuring Lender as mortgagee under the relevant Mortgage against loss or damage (including costs) occasioned by such contested claim.

## ARTICLE VIII

## NEGATIVE COVENANTS

Section 8.01 <u>Negative Covenants of Borrower</u>.    Until the Maturity Date and thereafter until no amount is due or owing to Lender hereunder, Borrower shall comply with the covenants, undertakings and agreements set forth in this <u>Article VIII</u> unless Lender shall otherwise consent in writing.

Section 8.02 <u>Amendment to Agreements</u>.    Borrower shall not, without the prior written consent of Lender, enter into or consent to any amendments or termination of the Loan Documents.

<div align="center">13</div>

Section 8.03 <u>Prohibition of Assignments and Encumbrances by Borrower</u>. Except as expressly contemplated hereby, until the provisions of this Agreement have been fully complied with, Borrower shall not, without the prior written consent of Lender, create, effect, consent to, attempt, contract for, agree to make, suffer or permit any Prohibited Transfer (as defined herein). Any conveyance, sale, assignment, transfer, lien, pledge, mortgage, security interest or other encumbrance or alienation, or attempt to do any of the foregoing, of any of the following rights, properties or interests which occurs, is granted, accomplished, attempted or effectuated without Lender's prior written consent shall constitute a "Prohibited Transfer" hereunder:

(a)    Borrower's interests under the Loan Documents or in the Property, or any part thereof, interest therein or earnings thereon, excepting only sales or other dispositions of collateral no longer useful in connection with the operation of the Property (herein called "<u>Obsolete Collateral</u>"), provided that prior to the sale or other disposition thereof, such Obsolete Collateral has been replaced by collateral of at least equal value and utility and subject to the liens and security interests of the Loan Documents with the same priority as such liens and security interests in the collateral as disposed of;

(b)    if Borrower, any Guarantor, any beneficiary of a trustee Borrower, any general partner in a partnership Borrower or partnership which is a beneficiary of a trustee Borrower is a corporation or any owner of substantially all of the stock of such corporation is itself a corporation (other than a corporate trustee or a corporation whose stock is publicly traded on a national securities exchange or on the National Association of Securities Dealer Automated Quotation System), any shares of capital stock of such corporation; or

(c)    if Borrower, any Guarantor or any beneficiary of a trustee borrower or Guarantor is a partnership or limited liability company, all or any part of the partnership or limited liability company interest, as the case may be, in such partnership or limited liability company;

in each case whether any such conveyance, sale, assignment, transfer, lien, pledge, mortgage, security interest, encumbrance or alienation is effected directly, indirectly, voluntarily or involuntarily, by operation of law or otherwise; provided, however, that the foregoing provisions of this Section shall not apply (i) to liens securing the Loan, (ii) to the lien of current taxes and assessments not in default or (iii) to a Permitted Transfer (as defined in the Guaranty)..

Section 8.04 <u>Disposal of Property</u>. Except for the Lease, Borrower shall not hereafter sell, abandon, lease, transfer or otherwise dispose of any of its properties, assets and rights to any Person.

Section 8.05 <u>Transactions with Affiliates</u>. Borrower shall not enter into any transaction, including without limitation the purchase, sale or exchange of property or the rendering of any service to any Affiliates, except in the ordinary course of and pursuant to the reasonable requirements of Borrower's business and upon fair and reasonable terms no less favorable to Borrower than would obtain in a comparable arm's-length transaction with an unaffiliated Person.

CHICAGO/#1726252.6

Section 8.06 <u>Maintain Existence, Merger, Etc.</u>  Borrower or any owner of Borrower shall not (i) dissolve or liquidate or amend or modify its Articles of Organization or its Operating Agreement; or (ii) except as specifically permitted by this Agreement, convey, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) any collateral securing the Loan, assets or option to acquire assets (whether now owned or hereafter acquired) to any Person; or (iii) convey, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of the assets of Borrower (whether now owned or hereafter acquired) to any Person; or (iv) purchase, lease or otherwise acquire all or substantially all of the assets or properties of, or acquire any capital stock, equity interests, debt or other securities of any Person, or enter into any joint venture or become a partner in any partnership; or (v) engage in any transaction out of the ordinary course of business; or (vi) merge or consolidate with any Person.

Notwithstanding the foregoing, Jacob Properties of Minnesota LLC ("<u>Owner</u>"), as the sole owner of Borrower, may, upon thirty (30) days prior written notice to Lender:

(i)  Transfer no more than a total of forty-nine percent (49%) of the ownership interest in Borrower to a corporate or partnership entity which is owned and controlled by Dennis E. Hecker ("<u>Mr. Hecker</u>") (i.e., 51% of the capital stock and voting rights in the case of a corporation or 51% of the profits, losses and distributions as well as voting interest in the case of partnership) so long as Owner retains voting control of Borrower;

(ii)  Transfer no more than a total of forty-nine percent (49%) of the ownership interest in Borrower, to the spouse, children, grandchildren or testamentary trust of Mr. Hecker the sole beneficiary of which are family members or grandchildren of Mr. Hecker so long as Owner retains voting control of Borrower; and

(iii)  Transfer of assets owned by Mr. Hecker or his estate following the death or judicial declaration of the incompetency of Mr. Hecker, so long as a substitute guaranty is provided pursuant to Section 9.01(n)(vii) below.

Section 8.07 <u>Sale and Lease-Back</u>.  Borrower shall not enter into any arrangement with any Person or to which such Person is a party providing for the leasing by Borrower of any principal asset which has been or is to be sold or transferred by Borrower to such Person or to any other Person to whom funds have been or are to be advanced by such Person on the security of such property or rental obligations of Borrower.

Section 8.08 <u>Purchase or Lease of Materials</u>.  Borrower shall not purchase or lease any materials, equipment, furniture or fixtures for installation on the Property under any security agreement, lease or other arrangement in which the seller or lessor reserves or purports to reserve any rights in such item or any right to remove or repossesses such item or to consider any such item personal property after its incorporation into the Project.

Section 8.09 <u>Debt</u>.  Borrower shall not incur, create, assume, become or be liable in any manner with respect to or permit to exist, any Indebtedness with respect to the Property.

Section 8.10 <u>Guaranties</u>.  Borrower shall not guarantee, endorse or otherwise in any way directly, indirectly or contingently become liable for the obligations or liabilities of any other

15

Person, except endorsements of negotiable instruments for collection in the ordinary course of business.

Section 8.11 <u>Line of Business</u>. Engage in any line of business which is not substantially associated with the business of the Project.

## ARTICLE IX

## EVENTS OF DEFAULT, REMEDIES UPON DEFAULT

Section 9.01 <u>Events of Default</u>. The occurrence of any of the following events shall be an "Event of Default" hereunder:

(a)    Borrower shall fail to pay any amount payable to Lender hereunder within five (5) days following the date such payment is due, it being understood and agreed that Lender shall have no obligation to provide any notice that any payment is due;

(b)    Except as set forth in subsection (a) above, any failure of Borrower or any Guarantor for a period of twenty (20) days (except as to Events of Default specified elsewhere in this Section or where a longer or shorter period is specified herein or in the other Loan Documents for a particular Event of Default) after written notice from Lender to Borrower to observe or perform any of the covenants of Borrower or any Guarantor under the terms of this Agreement or the other Loan Documents;

(c)    any event of default under the terms of the Loan and Security Agreement;

(d)    the termination of Dealer as a franchisee or dealer of Hyundai Motor America, whether such termination is voluntary or involuntary and regardless of the reason therefor;

(e)    any termination, satisfaction or payoff of the obligations and indebtedness secured under the terms of the Loan and Security Agreement;

(f)    the termination, expiration, or cancellation, or any default with respect thereto, under the Lease;

(g)    the occurrence of a Prohibited Transfer;

(h)    the existence of any collusion, fraud, dishonesty or bad faith by or with the acquiescence of Borrower or any Guarantor which in any way relates to or affects this Loan or the Project;

(i)    If at any time any material representation, statement, report or certificate made now or hereafter by Borrower or any Guarantor is not true and correct in any material respect, or if at any time any statement or representation made in the Loan Application submitted to Lender for this Loan is not true and correct, and such representation, statement, report or certificate is not corrected within fifteen (15) days after written notice thereof;

16

(j)    If all or a substantial part of the assets of Borrower or any Guarantor is attached, seized, subjected to a writ or distress warrant, or is levied upon, unless such attachment, seizure, writ, warrant or levy is vacated within thirty (30) days;

(k)    If Borrower or any Guarantor is enjoined, restrained or in any way prevented by court order from performing any of its obligations hereunder or under the other Loan Documents or conducting all or a substantial part of its business affairs; or if a proceeding seeking such relief is not dismissed within thirty (30) days of being filed or commenced; or if proceedings are commenced by any public or quasi-public body to acquire a material portion of the Property or any interest therein by power of condemnation or eminent domain and such proceedings are not dismissed within thirty (30) days of the commencement date;

(l)    If a notice of lien, levy or assessment is filed of record with respect to all or any part of the property of Borrower or any Guarantor by the United States, or any other governmental authority, unless contestable and actually and diligently contested in accordance herewith;

(m)    If there occurs a Material Adverse Change in the financial condition of Borrower or any Guarantor;

(n)    If Borrower or any Guarantor:

(i)    Shall file a voluntary petition in bankruptcy or for arrangement, reorganization or other relief under any chapter of the Federal Lenderruptcy Code or any similar law, state or federal, now or hereafter in effect;

(ii)    Shall file an answer or other pleading in any proceedings admitting insolvency, bankruptcy, or inability to pay its debts as they mature,

(iii)    Within thirty (30) days after the filing against it of any involuntary proceedings under the Federal Lenderruptcy Act or similar law, state or federal, now or hereafter in effect, such proceedings shall not have been vacated;

(iv)    Any order appointing a receiver, trustee or liquidator for it or for all or a major part of its property or the Premises shall not be vacated within thirty (30) days following entry thereof;

(v)    Shall be adjudicated a bankrupt;

(vi)    Shall make an assignment for the benefit of creditors or shall admit in writing its inability to pay its debts generally as they become due or shall consent to the appointment of a receiver or trustee or liquidator of all or the major part of its property, or the Property; or

(vii)    Shall die, or shall be judicially declared to be incompetent if a natural person, or if such party is a firm, partnership, corporation, or limited liability company, be dissolved, terminated or merged, except, solely with respect

17

to Mr. Hecker, if within one hundred twenty (120) days following such event, a guarantor, including Mr. Hecker's estate, whose net worth and liquidity are satisfactory to Lender in Lender's sole discretion not to be unreasonably withheld, executes and delivers to Lender a personal guaranty in a form satisfactory to Lender

Section 9.02 <u>Remedies Conferred upon Lender</u>. Upon the occurrence of any Event of Default, Lender, in addition to all remedies conferred upon Lender by law and by the terms of this Agreement and the Loan Documents, may pursue any one or more of the following remedies concurrently or successively, it being the intent hereof that none of such remedies shall be to the exclusion of any others:

(a)    Take possession of the Property and do anything required, necessary or advisable in Lender's sole judgment to fulfill the obligations of Borrower hereunder. Without restricting the generality of the foregoing and for the purposes aforesaid, Borrower hereby appoints and constitutes Lender as Borrower's lawful attorney-in-fact with full power of substitution in the premises to perform the following actions:

(i)    to use unadvanced Loan Proceeds or to advance funds in excess of the face amount of the Note;

(ii)    without inquiring into and without respect to the validity thereof, to pay, settle, or compromise all existing bills and claims which may be liens, or to avoid such bills and claims becoming liens, against the Property or any portion thereof as may be necessary or desirable for the completion of the construction and equipping of the Project or for the clearance of title to the Property;

(iii)    to prosecute and defend actions or proceedings in connection with the Property;

(iv)    to do any and every act which Borrower might do in its own behalf with respect to the Property, it being understood and agreed that this power of attorney shall be a power coupled with an interest and cannot be revoked.

(b)    Withhold further disbursement of the proceeds of the Loan and terminate any of its obligations to Borrower;

(c)    Declare the Note to be due and payable forthwith, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived;

(d)    In addition to any rights of setoff that Lender may have under applicable law, Lender may, without notice of any kind to Borrower, appropriate and apply to the payment of the Note or of all sums due under this Agreement any and all balances, deposits, credits, accounts, certificates of deposit, instruments or money of Borrower then or thereafter in the possession of Lender; and

(e)     Exercise or pursue any other remedy or cause of action permitted at law or at equity or under this Agreement or any other Loan Document, including but not limited to foreclosure of the Mortgage and enforcement of all Loan Documents.

Section 9.03  Right of Lender to Make Advances to Cure Defaults; Obligatory Advances. If Borrower shall fail to perform any of its covenants or agreements herein or in any of the other Loan Documents contained, Lender may (but shall not be required to) perform any of such covenants and agreements, and any amounts expended by Lender in so doing, and any amounts expended by Lender pursuant to Section 9.01 hereof and any amounts advanced by Lender pursuant to this Agreement shall be deemed advanced by Lender under an obligation to do so regardless of the identity of the person or persons to whom said funds are disbursed. Loan Proceeds advanced by Lender in the exercise of its judgment that the same are needed to preserve the Project to protect its security for the Loan are obligatory advances hereunder and shall constitute additional indebtedness payable on demand evidenced and secured by the Loan Documents.

Section 9.04  Attorneys' Fees.  Borrower will pay Lender's reasonable attorneys' fees and costs in connection with the administration and enforcement of this Agreement.  Without limiting the generality of the foregoing, if at any time or times hereafter the Lender employs counsel for advice or other representation with respect to any matter concerning Borrower, this Agreement, the Property or the Loan Documents or to protect, collect, lease, sell, take possession of, or liquidate any of the Property, or to attempt to enforce or protect any security interest or lien or other right in any of the Property or under any of the Loan Documents, or to enforce any rights of the Lender or obligations of Borrower or any other person, firm or corporation which may be obligated to Lender by virtue of this Agreement or under any of the Loan Documents or any other agreement, instrument or document, heretofore or hereafter delivered to Lender in furtherance hereof, then in any such event all of the attorneys' fees arising from such services, and any expenses, costs and charges relating thereto, shall constitute an additional indebtedness owing by Borrower to Lender payable on demand and evidenced and secured by the Loan Documents.

Section 9.05  No Waiver.  No failure by Lender to exercise, or delay by a Lender in exercising, any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof, or the exercise of any other right, power or privilege.  The rights and remedies provided in this Agreement and in the Loan Documents are cumulative and not exclusive of each other or of any right or remedy provided by law or equity.  No notice to or demand on Borrower in any case shall, in itself, entitle Borrower to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of Lender to any other or further action in any circumstances without notice or demand.

Section 9.06  Default Rate.  From and after the date of any Event of Default until the date on which such Event of Default is cured, interest on funds outstanding hereunder shall accrue at the Default Rate and be payable on demand.  The failure of Lender to charge interest at the Default Rate shall not be evidence of the absence of a Default or waiver of a Default by Lender.

CHICAGO/#1726252.6

**ARTICLE X**

**BORROWER'S INDEMNITY**

Section 10.01 <u>Borrower's Indemnity</u>. Borrower will indemnify and hold harmless each and every of the following persons or entities: (i) Lender; (ii) any persons or entities owned or controlled by, owning or controlling, or under common control or affiliated with, Lender; (iii) any participants and future co-lenders in the Loan; (iv) the directors, officers, partners, employees, attorneys, agents and representatives of each of the foregoing persons and entities; and (v) the heirs, personal representatives, successors and assigns of each of the foregoing persons and entities (individually, "<u>Indemnitee</u>" and collectively, the "<u>Indemnitees</u>") from and against: (a) any claim, action, loss or cost (including attorneys' fees and costs) arising from or relating to (i) any defect in the Property or the Project,  (ii) the performance or default of Borrower, Borrower's surveyors, architects, engineers or contractors or any other person, (iii) any failure to protect or insure the Project, (iv) the payment of costs of labor, materials or services supplied for the Project, (v) in connection with the protection and preservation of the Loan collateral (including those with respect to property taxes, insurance premiums, completion of construction, operation, management, improvements, maintenance, repair, sale and disposition), or (vi) the performance of any obligation  of Borrower whatsoever; (b) any and all liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses and disbursements (including attorneys' fees and costs) of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with (i) the execution, delivery, enforcement, performance or administration of any Loan Document, the Environmental Indemnity Agreement or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby, (ii) the Loan; or (iii) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) and regardless of whether any Indemnitee is a party thereto; and (c) any and all liabilities, losses, costs or expenses (including attorneys' fees and costs) that any Indemnitee suffers or incurs as a result of the assertion of any of the foregoing claims, demands, actions, causes of action or proceedings, or as a result of the preparation of any defense in connection with any of the foregoing claims, demands, actions, causes of action or proceedings, in all cases, whether or not an Indemnitee is a party to such claim, demand, action, cause of action or proceeding and whether it is defeated, successful or withdrawn (all of the foregoing, collectively, the "<u>Indemnified Liabilities</u>"); <u>provided</u> that such indemnity shall not, as to any Indemnitee, be available to the extent that such liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.  Nothing, including any advance or acceptance of any document or instrument, shall be construed as a representation or warranty, express or implied, to any party by Lender.  No inspection shall constitute an acknowledgment or representation by Lender that there has been or will be compliance with the Loan  Documents, the Environmental Indemnity Agreement or applicable laws, governmental requirements or restrictive covenants.  Any inspection, whether or not followed by notice of an Event Default, shall not constitute a waiver of any Event or Default then

20

existing, or a waiver of Lender's right thereafter to insist that the Project be in accordance with the Loan Documents, and all applicable laws, governmental requirements and restrictive covenants. Lender's failure to inspect shall not constitute a waiver of any rights of Lender under the Loan Documents or the Environmental Indemnity Agreement or at law or in equity.

### ARTICLE XI

### MISCELLANEOUS

Section 11.01 <u>Amendments, Etc</u>. No amendment or waiver of any provision of this Agreement or consent to any departure by Borrower therefrom shall in any event be effective, unless the same shall be in writing and signed by an officer of Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

Section 11.02 <u>Right of Set-off</u>. For so long as the Maturity Date has not occurred or any amount is due or owing to Lender hereunder, Lender shall have the right, following the expiration of any notice or cure periods set forth herein or in the Loan Documents, to set-off against any of Borrower's obligations to it under this Agreement any sum owed by Lender in any capacity to Borrower. Lender shall be deemed to have exercised such right of set-off and to have made a charge against any such sum immediately upon the occurrence of any Event of Default as defined herein, even though the actual book entries may be made at a time subsequent thereto.

Section 11.03 <u>Continuing Obligation</u>. This Agreement is a continuing obligation and shall (a) be binding upon Borrower and its successors and assigns, and (b) inure to the benefit of and be enforceable by Lender and its successors, transferees and assigns; provided, that Borrower may not assign all or any part of this Agreement without the prior written consent of Lender, which may be withheld for any reason in Lender's sole discretion. Lender may assign to any financial institution (including any participants) all or any part of or any interest (undivided or divided) in Lender's rights and benefits under this Agreement, and to the extent of that assignment, such assignee shall have the same rights and benefits against Borrower hereunder as it would have had if such assignee were Lender. Neither any such assignment nor any such rights and benefits shall in any way whatsoever affect the obligations of Lender hereunder or the scope of the obligations or the nature of the rights of Borrower hereunder.

Section 11.04 <u>Liability of Lender</u>. Neither Lender nor any of Lender's officers, directors, shareholders, employees, independent contractors or agents shall be liable or responsible to the Borrower for: (a) the accuracy, validity, sufficiency, genuineness or collectibility of any drafts, certificates, instruments, notices of default, or other documents, or of any endorsement(s) or signatures thereon, even if any of the foregoing should in fact prove to be in any or all respects invalid, fraudulent or forged, except to the extent any invalidity relates to the execution of a document by Lender; (b) compliance with or circumstances resulting from the existence or exercise of applicable laws, regulations, customs controls or restrictions by any government or by any group asserting or exercising de facto or de jure governmental powers; (c) any errors, omissions, interruptions or delays in transmission or delivery of any messages, however sent and whether plain or in code or cipher, or errors in translation or in interpretation of technical or other terms; (d) any event, fact or condition beyond the control of Lender; or

21

(e) without limiting the foregoing, any act or omission of Lender or any of Lender's correspondents, agents or subagents done or omitted in good faith.

Section 11.05 <u>Lender's Right to Assign</u>.  Lender may assign, negotiate, pledge or otherwise hypothecate this Agreement or any of its rights and security hereunder, including the Note, Mortgage, and other Loan Documents to any bank, participant or financial institution, and in case of such assignment, Borrower will accord full recognition thereto and agree that all rights and remedies of Lender in connection with the interest so assigned shall be enforceable against Borrower by such bank, participant or financial institution with the same force and effect and to the same extent as the same would have been enforceable by Lender but for such assignment. Any assignment or other transfer of this Agreement or of any Lender's rights hereunder shall not relieve Lender of its obligations to Borrower under this Agreement.

Section 11.06 <u>Costs, Expenses and Taxes</u>.  Borrower agrees to pay on demand all costs and expenses in connection with the preparation, execution, delivery, and administration of this Agreement and any other documents which may be delivered in connection with this Agreement, including without limitation the reasonable fees and out-of-pocket expenses of counsel for Lender with respect to advising Lender as to its rights and responsibilities under this Agreement and the Loan Documents, taxes, title company fees, insurance costs or expenses advanced by Lender on Borrower's behalf in its sole discretion; and all costs and expenses, if any, in connection with the enforcement of this Agreement, the Loan Documents and such other documents which may be delivered in connection with this Agreement.  In the event that the transaction or any portion thereof contemplated hereby shall fail to close for any reason through no fault of Lender, Borrower shall nevertheless be liable to Lender for full payment of the aforementioned costs, fees and expenses.  In addition, Borrower shall pay any and all stamp and other taxes and fees payable or determined to be payable in connection with the execution, delivery, filing and recording of this Agreement or the Loan Documents, and agrees to save Lender harmless from and against any and all liabilities with respect to or resulting from any delay in paying or omission to pay such taxes and fees.

Section 11.07 <u>Notices</u>.  Any notice, demand, request or other communication which any party hereto may be required or may desire to give hereunder shall be in writing and shall be deemed to have been properly given (a) if delivered, when delivered; (b) if mailed by United Stated Certified Mail (Postage prepaid, return receipt requested), three (3) Business Days after mailing (c) if by Federal Express or other reliable overnight courier service, on the next Business Day after delivered to such courier service or (d) if by telecopier on the day of transmission if before 3:00 p.m. (California time) on a Business Day so long as a copy is sent on the same day by overnight courier as set forth below:

<div style="margin-left:2em">

If to Borrower:        Jacob Holdings of UpNorth LLC
                       500 Ford Road
                       Minneapolis, Minnesota 55426
                       Attention:  Dennis E. Hecker
                       Telephone:  952-512-8898
                       Facsimile:  952-512-8945

</div>

CHICAGO/#1726252.6

| With a copy to : | Kaplan, Strangis and Kaplan, P.A.<br>90 South 7th Street, Suite 5500<br>Minneapolis, MN 55402<br>Attention: Bruce Parker<br>Telephone: 612-395-1143<br>Facsimile: 612-395-1138 |
|---|---|
| If to Lender: | Hyundai Motor Finance Company<br>10550 Talbert Avenue<br>Fountain Valley, California 92708<br>Attention: National Manager Commercial Credit<br>Telephone: 714-965-7500<br>Facsimile: 714-965-7010 |
| With a copy to: | Hyundai Motor Finance Company<br>10550 Talbert Avenue<br>Fountain Valley, California 92708<br>Attention: General Counsel<br>Telephone: 714-965-3912<br>Facsimile: 714-965-3815 |
| With a copy to : | Vedder, Price, Kaufman & Kammholz, P.C.<br>222 North LaSalle Street, Suite 2600<br>Chicago, Illinois 60601<br>Attention: Michael A. Nemeroff, Esq.<br>Telephone: 312-609-7858<br>Facsimile: 312-609-5005 |

or at such other address as the party to be served with notice may be furnish in writing to the party seeking or desiring to serve notice as a place for the service of notice. Any notice or demand delivered to the person or entity named above to accept notices and demands for such party shall constitute notice or demand duly delivered to such party, even if delivery is refused.

Section 11.08 Severability. Any provision of this Agreement which is unenforceable or not authorized in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition, unenforceability or non-authorization without invalidating the remaining provisions hereof or affecting the validity, enforceability or legality of such provision in any other jurisdiction.

Section 11.09 Governing Law; Jury Trial Waiver; Venue. This Agreement shall be governed by, and construed in accordance with, the law of the State of California without regard to principles of conflict of laws.

BORROWER AND LENDER HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING (I) TO ENFORCE OR DEFEND ANY RIGHTS UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE LOAN DOCUMENTS OR ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR

23

WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION HEREWITH OR THEREWITH, OR (II) ARISING FROM ANY DISPUTE OR CONTROVERSY IN CONNECTION WITH OR RELATED TO THIS AGREEMENT, THE LOAN DOCUMENTS OR ANY SUCH AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT, AND AGREES THAT ANY SUCH ACTION OR COUNTERCLAIM SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE BY BORROWER AND LENDER, AND BORROWER AND LENDER HEREBY REPRESENT THAT NO REPRESENTATIONS OF FACT OR OPINION HAVE BEEN MADE BY ANY PERSON OR ENTITY TO INDUCE THIS WAIVER OF TRIAL BY JURY OR TO IN ANY WAY MODIFY OR NULLIFY ITS EFFECT. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES ENTERING INTO THIS AGREEMENT. BORROWER AND LENDER ARE EACH HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION 11.09 IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER OF JURY TRIAL. BORROWER FURTHER REPRESENTS AND WARRANTS THAT IT HAS BEEN REPRESENTED IN THE SIGNING OF THIS AGREEMENT AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, OR HAS HAD THE OPPORTUNITY TO BE REPRESENTED BY INDEPENDENT LEGAL COUNSEL SELECTED OF ITS OWN FREE WILL, AND THAT IT HAS HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL.

BORROWER IRREVOCABLY AGREES THAT, SUBJECT TO LENDER'S SOLE AND ABSOLUTE ELECTION, ANY ACTION OR PROCEEDING IN ANY WAY, MANNER OR RESPECT ARISING OUT OF THIS AGREEMENT, THE LOAN DOCUMENTS OR ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION HEREWITH OR THEREWITH, OR ARISING FROM ANY DISPUTE OR CONTROVERSY ARISING IN CONNECTION WITH OR RELATED TO THIS AGREEMENT, THE LOAN DOCUMENTS OR ANY SUCH AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT SHALL BE LITIGATED ONLY IN THE COURTS HAVING SITUS WITHIN THE COUNTY OF ORANGE, CALIFORNIA, AND BORROWER HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY LOCAL, STATE OR FEDERAL COURT LOCATED WITHIN SUCH CITY AND STATE. BORROWER HEREBY WAIVES ANY RIGHT IT MAY HAVE TO TRANSFER OR CHANGE THE VENUE OF ANY LITIGATION BROUGHT AGAINST IT BY LENDER IN ACCORDANCE WITH THIS SECTION.

Section 11.10 Headings.  Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

Section 11.11 Approval or Consent of Lender.  Wherever in this Agreement provision is made for the approval or consent of Lender, or that any matter is to be to Lender's satisfaction, or that any matter is to be as estimated or determined by Lender, or the like, unless specifically stated to the contrary, such approval, consent, satisfaction, estimate or determination or the like shall be made, given or determined by Lender pursuant to a reasonable application of judgment in accordance with institutional lending practice and commercial custom in connection with major real estate loans.

CHICAGO/#1726252.6

**[SIGNATURE PAGE FOLLOWS]**

CHICAGO/#1726252.6

*Signature Page to Loan Agreement*

LENDER:

**HYUNDAI MOTOR FINANCE
COMPANY**, a California corporation

By: _____
Name: _____
Title: _____

*Signature Page to Loan Agreement*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

BORROWER:

**JACOB HOLDINGS OF UPNORTH LLC**, a Minnesota limited liability company

By:
Name: Erik P. Dove
Title: Manager and Vice President

## INDEX OF EXHIBITS AND SCHEDULES

Exhibit A: Legal Description

Annex I: Definitions

EXHIBIT A

LEGAL DESCRIPTION

ADDRESS:              16604 State Highway 371, Baxter, Minnesota 56401-6925

That part of the Southeast Quarter of the Northeast Quarter (SE¼ NE¼), Section Twenty-five (25), Township One Hundred Thirty-four (134), Range Twenty-nine (29) described as follows:

Commencing at the point on the East line of said Southeast Quarter of the Northeast Quarter which is 198.6 feet North of the Southeast corner of said Southeast Quarter of the Northeast Quarter; thence West 33 feet to the intersection of the right of way for Highway No. 371 and a township road, the place of beginning; thence North 84 degrees 23 minutes West 102.4 feet along the right of way line for Trunk Highway No. 371; thence North 42 degrees 47 minutes West 1,000 feet continuing along said highway right of way line; thence North 71 degrees 51 minutes East 822.13 feet to the Westerly right of way line for the township road; thence South 1,000 feet along said township road to the place of beginning.

Except two portions thereof described as follows:

(1) Commencing at the Southeast corner of said Southeast Quarter of the Northeast Quarter; thence North along the East line thereof for a distance of 1,198.6 feet; thence West for 33 feet to the West line of the township road to the point of beginning of the tract hereby conveyed; thence South for 200 feet along said township road line; thence West for 300 feet; thence North for 101.65 feet to the North line of the tract conveyed to Leo D. Morrison and Norma G. Morrison by the Deed recorded in Book 189 of Deeds, page 19 and thence North 71 degrees 51 minutes East for 315.71 feet along the North line of said Morrison tract to the place of beginning.

(2) Commencing at the point on the East line of said Southeast Quarter of the Northeast Quarter, which is 198.6 feet North of the Southeast corner of said Southeast Quarter of the Northeast Quarter; thence West 33 feet to the intersection of the right of way line for Trunk Highway Number 371 and a township road, the place of beginning; thence North 84 degrees 23 minutes West 102.4 feet along said right of way line for Trunk Highway Number 371; thence North 42 degrees 47 minutes West 500.00 feet continuing along said right of way line for Trunk Highway Number 371; thence North 53 degrees 48 minutes 40 seconds East 547.06 feet to the Westerly right of way line for said township road; thence South 700.00 feet along said right of way line for township road to the place of beginning.

Crow Wing County, Minnesota

**ANNEX I**

**DEFINITIONS**

"ADA" means the Americans with Disabilities Act, 42 U.S.C. §§ 12101, et. seq., as hereinafter amended or modified.

"Affiliates" means any Person (i) which directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, Borrower, (ii) which beneficially owns or holds five percent (5%) or more of the voting control or equity interests of Borrower, or (iii) five percent (5%) or more of the voting control or equity interests of which is beneficially owned or held by Borrower.

"Agreement" means this Loan Agreement made by and between Borrower and Lender.

"Borrower" means Jacob Holdings of UpNorth, LLC.

"Business Day" means any day other than a Saturday, Sunday or any day that banking institutions in the city in which the principal office of Lender is located are closed.

"Closing Date" means the date of this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Dealer" means Baxter Imports, LLC.

"Default Rate" means a rate of interest per annum, based on a year of 360 days, equal to the Interest Rate plus three percent (3%).

"Dollar" and the sign "$" mean lawful money of the United States of America..

"Endorsements" has the meaning assigned to that term in Section 3.01(k) of this Agreement.

"Environmental Indemnity Agreement" means that certain Environmental Indemnity Agreement dated of even date herewith, executed by Borrower and Guarantor for the benefit of Lender with respect to the Project, as amended, modified or restated from time to time.

"Environmental Reports" means that certain Phase I Environmental Site Assessment dated August 30, 2007, as prepared by Liesch Associates, Inc.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time. Section references to ERISA are to ERISA as in effect on the date of this Agreement and any subsequent provisions of ERISA, amendatory thereof, supplemental thereto or substituted therefor.

"Event of Default" has the meaning assigned to that term in Section 9.01 hereof.

"FEMA" means the Federal Emergency Management Agency.

"Financial Statements" has the meaning assigned to that term in Section 6.01(i) hereof.

"Financing Statements" means those certain UCC Financing Statements filed in the recorder's office of the county in which the Property is located and in the secretary of state's office or other applicable official's office in the state in which the Borrower is organized or incorporated.

"GAAP" means generally accepted accounting principles.

"Guarantor" means collectively, each of the following: the Dealer and Dennis E. Hecker.

"Indebtedness" means, with respect to any Person, all obligations and liabilities to any other Person (including without limitation, all debts, claims and indebtedness) whether primary, secondary, direct, contingent, fixed or otherwise, heretofore, now and/or from time to time hereafter owing, due or payable, however evidenced, created, incurred, acquired or owing and however arising, whether under written or oral agreement, by operation of law, or otherwise, except (i) rental installments not past due under leases which are not capital leases and (ii) claims which if sustained will be discharged by issuers of policies of insurance maintained by such Person. Indebtedness includes, without limiting the generality of the foregoing: (i) obligations or liabilities that are secured by any lien, claim, encumbrance or security interest upon property even though such Person has not assumed or become liable for the payment therefor; and (ii) obligations or liabilities created or arising under any lease of real or personal property, or conditional sale or other title retention agreement with respect to property used and/or acquired by such Person, even though the rights and remedies of the lessor, seller and/or lender thereunder are limited to repossession of such property.

"Interest Rate" means the floating rate equal to the Three Month LIBOR Rate plus Two and Eight-Five One Hundredths Percent (2.85%) adjusted at the beginning of each month.

"Lease" means that certain Lease dated as of November 30, 2007 between Borrower and Dealer.

"Lender" means Hyundai Motor Finance Company and its successors and assigns.

"Lien" means, with respect to any asset, any mortgage, pledge, charge, hypothecation, judgment lien or similar legal process, title retention lien or other lien or security interest or encumbrance of any kind in respect of such asset. For the purposes of this Agreement, a Person shall be deemed to own, subject to a Lien, any asset which it has acquired or holds subject to the interest of a vendor or lessor under any conditional sale agreement, or other title retention agreement relating to such asset.

"Loan" means the loan to be made pursuant to this Agreement in the amount set forth in the Recitals hereof.

"Loan and Security Agreement" means that certain Inventory Loan and Security Agreement by and between Lender and Dealer, as may be amended, modified, substituted or restated from time to time.

6

"Loan Documents" means this Agreement, Note, the Mortgage, the Environmental Indemnity Agreement, the Subordination Agreement, the Loan and Security Agreement and any other agreements, instruments and documents now or hereafter entered into relating thereto or to this Agreement and to the transactions contemplated thereby or hereby and to which Borrower is a party or which secures the obligations of Borrower to Lender, together with all amendments, modifications, and restatements thereof.

"Loan Expenses" means all costs of the Lender associated with the Loan.

"Loan Policy" has the meaning assigned to that term in Section 3.01(k) of this Agreement.

"Loan Proceeds" means any funds disbursed in accordance with the Loan.

"Material Adverse Change" means in Lender's reasonable discretion, the business prospects, operations or financial condition of a person, entity or property has changed in a manner which could impair the value of Lender's security for the Loan, prevent timely repayment of the Loan or otherwise prevent the applicable person or entity from timely performing any of its material obligations under the Loan Documents.

"Maturity Date" means December 28, 2012 or earlier if by acceleration or otherwise.

"Mortgage" means that certain Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing, of even date herewith made by Borrower in favor of Lender which constitutes a first mortgage lien on the Property, as amended, restated.

"Note" shall mean that certain Business Purpose Promissory Note of even date herewith in the maximum original principal amount of TWO MILLION THREE HUNDRED THOUSAND DOLLARS ($2,300,00.00).

"Obligations" means all Indebtedness or other obligations of Borrower to Lender, whether now existing or hereafter arising and whether absolute or contingent, arising under or pertaining to this Agreement, the Loan Documents or otherwise.

"Obsolete Collateral" means collateral no longer useful in connection with the operation of the Property.

"Permits" means all necessary permits for development of the Project issued by any governmental authority having jurisdiction over the Project including, but not limited to, demolition, building, foundation, structural, mechanical, electrical, plumbing and curb- or road-cut permits.

"Permitted Encumbrances" means:

(a)    Mortgages or security interests granted to Lender, including, without limitation, the Mortgage;

7

     (b)    Liens, pledges or deposits in connection with worker's compensation, unemployment insurance, old age benefits, social security obligations, taxes, assessments, statutory obligations, or other similar charges, good faith deposits in connection with tenders, contracts or leases to which Borrower is a party, or other deposits required to be made; provided, in each case, that the obligation or liability arises in the ordinary course of business and is not overdue, or if overdue, is being contested in good faith by appropriate proceedings, and that the obligation is not for borrowed money;

     (c)    Mechanics', workmen's, materialmen's, landlords', carriers' or other like liens arising in the ordinary course of business with respect to obligations which are not due or which are being contested in good faith in the manner described in Section 7.11 hereof;

     (d)    the Lease; and

     (e)    Additional matters as to which Lender gives its approval in writing.

"Person" means an individual, a corporation, a limited liability company, an association, a joint stock company, a business trust, a partnership, a joint venture, an unincorporated organization, or any other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

"Project" has the meaning assigned to that term in the first paragraph of the Recitals hereof.

"Property" has the meaning to that term in the Recitals hereof.

"Reserves" has the meaning assigned to that term in Section 4.01.

"RICO Related Law" means the Racketeer Influenced and Corrupt Organizations Act of 1970 or any other federal, state or local law for which forfeiture of assets is a potential penalty.

"Subordination Agreement" means that certain Subordination and Attornment Agreement of even date herewith between Borrower, Lender and Dealer.

"Three Month LIBOR Rate" means the per annum "London Interbank Offered Rate" of interest offered for three month rate periods as set forth in The Wall Street Journal or, if The Wall Street Journal is not published on any applicable Business Day, a rate per annum equal to the offered rate for 30-day deposits in Dollars for each day of a monthly billing period that appears on Telerate pages 3750 as of approximately 11:00 A.M. (London time).   "Telerate Page 3750" means the display designated as "Page 3750" on the Telerate Service (or such other page as may replace page 3750 on that service or such other service as may be nominated by the British Lenders' Association as the information vendor for the purposes of displaying British Lenders' Association Interest Settlement Rates for Dollar Deposits) a Telerate Page 3750 or any successors thereto.   The Three Month LIBOR Rate applicable to any day on which no rate is published will be the rate last quoted prior to such day.

"Title Company" means Chicago Title Insurance Company.

"Uniform Commercial Code" means the Uniform Commercial Code of the State in which the Property is located as in effect on the date of this Agreement, as the same may be amended, modified or restated from time to time.

"Unmatured Event of Default" means any event which, with lapse of time or notice or lapse of time and notice, will constitute an Event of Default if it continues uncured.

9

## ACKNOWLEDGMENT

The undersigned title company ("Title Company"), hereby acknowledges and agrees to the terms and provisions set forth in Section 2.05 of that certain Loan Agreement by and between Hyundai Motor Finance Company and Jacobs Holdings of Upnorth LLC, a copy of which has been delivered to said Title Company.

LANDAMERICA COMMONWEALTH

By: *Laurel A. Forrest*

Name: *Laurel A. Forrest*

Title: *Escrow Officer*